MARTHA A. EGGELING, ADMINISTRATRIX, APPELLEE, V. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY ET AL., APPELLANTS.

FILED DECEMBER 31, 1929. No. 26914.

*E. P. Holmes* and *Guy C. Chambers*, for appellants.

*Burkett, Wilson, Brown & Wilson, contra.*

Heard before GOSS, C. J., ROSE, GOOD, THOMPSON, EBERLY and DAY, JJ., and THOMSEN, District Judge.

THOMSEN, District Judge.

Action by Martha A. Eggeling, Administratrix of the Estate of Frank R. Eggeling, deceased, against the Chicago, Rock Island & Pacific Railway Company to recover damages for Eggeling's death occurring at a highway crossing near the town of Rokeby, Nebraska, at about 4 o'clock in the afternoon of July 28, 1927. The engineer was joined as a party defendant. Judgment for plaintiff was entered on a verdict by the jury. The defendants appeal.

Eggeling had been hauling grain to an elevator located on a side-track north and east of the highway crossing. He was familiar with the crossing. His farm was nearby. Rokeby was his trading point. The crossing, which was over the main track of the railroad, was the one customarily used by him to reach the town. On the day of the accident he had hauled five wagon loads of grain over this crossing to the elevator. At the time of the accident Eggeling was returning with an empty wagon from the elevator. The tracks are approximately at right angles to the highway. The highway at this point lies east and west. Eggeling was traveling westward. The train was coming from the north. The collision took place when the wagon was on the tracks of the oncoming train. The horses were in the clear. To one coming from the east the view to the northward, the direction from which the train was coming, was considerably obstructed. The obstructions consisted

of a hedge and weeds about 75 feet east and north of the crossing, the depot about 78 feet north of the crossing and near the tracks, two small buildings north and east of the depot, and a string of freight cars on a side-track east of these buildings. The track curved slightly eastward; but, since the curve began at a point about 325 feet north of the crossing, the curved condition could not enter as a factor in what transpired. To the northwest, part of the tracks could be seen from the highway at various distances ranging from 60 feet to within 22 feet east of the crossing, disclosing the main track at points, respectively, 1,037 feet, 900 feet, 827 feet, and 340 feet north of the crossing. After the 22-foot point, the prospect along the tracks and past the obstructions was an ever widening and lengthening one. Practically undisputed testimony shows that to the north the west rail could be seen from the highway at the following varying distances: 22 feet east of the east rail, 340 feet; 20 feet east, 440 feet; 15 feet east, 780 feet; and along the highway 10 feet from the east rail the west rail of the main track could be seen 1,210 feet north. The accuracy of these distances is strongly attacked by the plaintiff, not so much by testimony, but by a series of mathematical calculations by which results of shorter distances are reached. However, in such calculations the plaintiff failed to consider that the highway describes a slightly acute angle and that the distance along the highway to the track is greater than the distance to the nearest point. Thus, one standing on the highway is actually nearer the track than the distance from the same point to the track along the highway. Even a few inches make a material difference in such calculations. At any rate the camera views furnish a reliable basis of corroboration for the foregoing measurements; and the figures given above may be accepted as substantially correct.

The train was proceeding at 40 miles an hour; Eggeling at 3 miles an hour. Thus, multiplying the speed by 1½, the train was proceeding about 60 feet a second while Eggeling was traveling about 4½ feet a second. It would require 4 seconds for Eggeling to travel 18 feet. So, when

Eggeling was 18 feet from the track, the train was about 240 feet from the crossing. Twenty feet from the crossing it was possible for Eggeling to see up the track 440 feet. At 22 feet away he had a view of 340 feet, a greater distance up the track than the engine would be at that moment. At the speed at which Eggeling was traveling, at all the points where even only momentary views were possible, some portion of the train would have been visible to him. Thus, it is apparent that if Eggeling had looked at any time after passing the 22-foot point, or at the earlier places, he would have seen the train, and that he either did not look or proceeded to cross the tracks in reckless disregard of what he saw.

It may be true that the bell was not rung nor the whistle blown, although evidence to the contrary is substantial; but applying the oft repeated rule that the evidence should be considered in a light most favorable to this appellee, yet Eggeling was bound to do something in his own behalf. He may not, in reckless disregard of any possible negligence of the railroad, rely solely upon its statutory duty, proceed to a place of danger, and expect the train, which cannot turn out or stop instantly, to be an insurer of his safety. If he does nothing for his own security he is negligent, and if the physical facts leave no doubt so that reasonable minds would not differ in that he either proceeded recklessly or failed without reasonable excuse to take the precautions which the conditions indicate were available to him, he is as a matter of law guilty of negligence more than slight, which under our rule of comparative negligence bars a recovery. *Baltimore & O. R. Co. v. Goodman*, 275 U. S. 66; *Rickert v. Union P. R. Co.*, 100 Neb. 305; *Seiffert v. Hines*, 108 Neb. 62; *Haffke v. Missouri P. R. Corporation*, 110 Neb. 125; *Stanley v. Chicago, R. I. & P. R. Co.*, 113 Neb. 280; *Tyson v. Missouri P. R. Corporation*, 113 Neb. 504; *Allen v. Omaha & S. I. R. Co.*, 115 Neb. 221, and annotation in 41 A. L. R. 405.

The day was clear. The crossing and physical surroundings were all familiar to Eggeling. Under the conditions it cannot be said that the obstructions furnished "a reason-

able excuse" for a failure to stop, look, and listen. If, because of his position in the wagon, the time and distance may have been shortened within which to divert his horses from a direct course or to completely stop to avoid a collision after he could have seen the engine, it may have been the part of wisdom and only a reasonable precaution causing him but slight inconvenience to have led his horses by the head across the place of danger. But, regardless of the position he occupied in the wagon, he himself had fully 20 feet and more than 4 seconds in which to see the train approaching and in which to act for his own safety.

"It has long been the law that, when a person goes into a place of danger, known by him to be a dangerous place, he must exercise care for his own safety commensurate with the dangers and incidental perils he encounters in entering the place." *Conrad v. Wheelock,* 24 Fed. (2d) 996.

Complaint is made that the speed of the train was excessive. The speed was stipulated to be 40 miles an hour. The evidence does not show that such speed is unusual at this point, nor has appellee shown that under the conditions such speed is in any sense unlawful. Eggeling's duty of self-protection was not lessened by reason of any excessive speed. His obligation to stop, look, and listen, when any of these or all would have proved beneficial, remained the same although the speed were excessive. "Failure to do so is negligence more than slight in comparison with that of defendant, and will defeat a recovery, even though the whistle was not blown and the bell not rung, *or the speed may have been excessive." Lewis v. Union P. R. Co.,* 118 Neb. 705. See *Moreland v. Chicago & N. W. R. Co.,* 117 Neb. 456; *Askey v. Chicago, B. & Q. R. Co.,* 101 Neb. 266.

Appellee also contends that a strong wind from the south made it impossible or difficult to hear the sound of the approaching train. If true, yet his security was not solely dependent upon his sense of hearing. If his safety were impaired on account of this factor, a fair sense of caution should have impelled him to exercise even greater care in looking and stopping.

In view of all the foregoing, instruction No. 10 requested by defendants and refused by the court should have been given. In this instruction the jury would have been directed to return a verdict for the defendants, which would have been clearly correct in view of the law so strongly established in this state.

"The accident was most unfortunate, but this is a lawsuit; it is governed by rules of law. Judges sitting upon the bench find no pleasure in denying a widow a recovery in a case of this character. It is easy to deny a motion for a directed verdict and let the jury pass upon the facts, and then more or less embarrassing to have to set aside the verdict. Expenses and inconvenience accumulate, and yet eventually any judgment based on such facts as appear here must be reversed. The *Goodman* case, *supra*, was just such a case. The opinion in that case was a clear admonition by the supreme court to trial courts to apply the law." *Conrad v. Wheelock*, 24 Fed. (2d) 996.

In appellee's argument it is intimated that the law places no burden upon the railroad if the failure to stop, look, and listen should in all cases bar recovery, even though the railroad fails to sound any warning as required by section 5377, Comp. St. 1922, as amended by chapter 168, Laws 1927, and even though the injured one had largely relied upon the fulfilment of the duty which such law imposes; that the failure to sound such warning was intended by the legislature to fix liability. However, this court has consistently held ever since 1895 when, in *Chicago, B. & Q. R. Co. v. Metcalf*, 44 Neb. 848, the *effect* of the law was thoroughly considered, that the failure to give the required warning did not establish negligence, but was merely *evidence* of it. If the people were dissatisfied with the state of the law as it exists, it would seem that the legislature would have fixed a different standard; and the very fact that during 35 years since that decision no change has been made in that portion of the law we now consider, would seem to indicate general popular satisfaction. At any rate, the court can only interpret and apply the law, not change it.

Other errors at the trial are claimed by appellants, but the foregoing disposes of the case; therefore such other claimed errors need not be discussed. For the reasons given, the judgment of the district court is reversed, with directions to dismiss.

REVERSED.

PER CURIAM.

The following opinion on motion for rehearing was filed May 2, 1930. *Paragraph of syllabus withdrawn.*

On reargument of this cause, the rule announced in second paragraph of syllabus is withdrawn because unnecessary to a decision of the cause. In all other respects the former opinion is adhered to.

# CASES DETERMINED

## IN THE

# SUPREME COURT OF NEBRASKA

### JANUARY TERM, 1930.

IN RE ESTATE OF JOHN J. MAAG.

ALICE M. MAAG, APPELLEE, V. ESTATE OF JOHN J. MAAG, APPELLANT.

Heard before GOSS, C. J., ROSE, GOOD, THOMPSON, EBERLY and DAY, JJ., and FOSTER and SHEPHERD, District Judges.

1. **Husband and Wife: ANTENUPTIAL CONTRACTS.** "Antenuptial contracts between persons contemplating matrimony, determining the prospective rights of each in the property of both parties during and after marriage, are not against public policy and are enforceable." *Rieger v. Schaible*, 81 Neb. 33.

2. ___: **CONSTRUCTION.** ... a court of equity, when called upon to consider ... and construe the instrument in the light of the circumstances surrounding that particular case and enforce or annul the agreement according to the facts disclosed in the case before it. No arbitrary rule can be laid down which would apply to all antenuptial arrangements." *Rieger v. Schaible*, 81 Neb. 33.

___: **VALIDITY.** "In view of the close and confidential relation existing between an engaged couple, it is incumbent upon the prospective husband to make a full and fair disclosure of all material facts relating to the amount, character and value of his property, so that the prospective wife may have sufficient knowledge upon which she may exercise her judgment whether she will enter into such a contract." *In re Estate of Enyart*, 100 Neb. 337.

___: ... such antenuptial contracts are apparently unjust to the wife and fairly procured." *In re Estate of Enyart*, 100 Neb. 337.

5. **Jury.** An appeal from the refusal of the county court to make an allowance out of the estate of a deceased husband for the support of his widow is not ...

In re Estate of Maag.

6. **Husband and Wife:** Antenuptial Contracts: Allowance to Widow. Under the facts and circumstances in this case, *held*, that the antenuptial contract in question is not a valid bar to the widow's allowance for her support out of her husband's estate, and the judgment of the district court is affirmed for the reasons set forth in the opinion.

Appeal from the district court for Douglas county: Alexander C. Troup, Judge. *Affirmed.*

*William G. Rutledge* and *Gray & Brumbaugh*, for appellant.

*Mulfinger & Webb* and *Shotwell & Ready*, contra.

Heard before Goss, C. J., Good, Thompson, Eberly and Day, JJ., and Foster and Shepherd, District Judges.

Goss, C. J.

This is an appeal on behalf of the estate of John J. Maag, deceased, from the judgment of the district court. That court reversed the judgment of the county court and directed it to make a reasonable allowance to the widow for her support pending the settlement of the estate.

John J. Maag died November 10, 1927. His will, executed October 10, 1923, was proved and admitted to probate in Douglas county, January 24, 1928. The testator was survived by Alice M. Maag, his widow, who petitioned for the allowance; and by two sons and two daughters, born to him and a former wife, who died long prior to his marriage to the petitioner. The will provided for all of them. The only mention of the petitioner and the only provision for her constituted the third paragraph of the will and is in these words:

"To my wife, Alice M. Maag, if she then be living within six months after my death, the sum of five thousand dollars." This payment to be in lieu of all my wife's statutory rights as my said wife, and as full performance of the agreement between us.

The agreement referred to in the will was an antenuptial contract executed by John J. Maag and petitioner, then Alice M. Smith, in the forenoon of June 2, 1923, before

their marriage later on that same day. More will be stated as to this agreement later in the opinion.

On the same day the will was admitted to probate, Alice M. Maag filed in the county court her written election refusing to accept the provision made for her in the will and electing, in lieu thereof, to take under and by virtue of the laws of Nebraska; and on the same day she filed in the county court a petition asking that court to make her an allowance of $150 a month for her support as the widow. Thereupon the executor filed his answer and objections to the petition, setting up the antenuptial agreement entered into by the petitioner, by which it was alleged she bound herself to take $5,000 upon testator's death and to waive all other claims against his estate. Completed issues were made by her reply, which particularly raised the issue of lack of fair disclosure of the value of the property of John J. Maag and of the nature, character and value of the estate she was relinquishing. On a hearing the county court found that a full and fair disclosure of the extent and value of both his real and personal property was made by John J. Maag to her prior to the execution of the antenuptial agreement, and that she was fully capable and had the ability and opportunity to determine the value of his estate and did so determine the extent and value thereof prior to the execution of the agreement; that the agreement was a bar to said widow's participation in the distribution of the estate, except as to the sum provided in the will; that she was estopped from making any further claims to the proceeds of the estate, and that the terms of the antenuptial agreement should be upheld and enforced. The order of the county court, after making the findings above abstracted, concluded with the following judgment:

"It is therefore considered, ordered, adjudged and decreed that said antenuptial agreement is a valid agreement; that the terms of said agreement operate as a bar to and prevent the petitioner, Alice M. Maag, from participating as the widow of said John J. Maag in any distributive share of said estate, other than that named in said antenuptial agreement, and as provided for by decedent's will, and the

petition of said widow for an allowance of said estate should be and is hereby overruled."

In the district court, after part of the reply was stricken as presenting an issue not pleaded in the county court, the issues were pleaded as they were in the county court. The reply concluded with a prayer for the "allowance asked for in the petitioner's original petition, and for such other and further relief as to the court may appear she may be justly entitled."

The case was classified as a law case, was placed upon the law docket, and when it was reached for trial, "a trial by jury having been waived by agreement of parties," the cause was tried before the late Alexander C. Troup, district judge, and submitted to the court on all questions of law and fact. The court found generally and specifically for Alice M. Maag and against the executor and estate. The final judgment particularly found that John J. Maag did not make to the petitioner the full and fair disclosure of his property, as required by law, prior to the execution by her of the antenuptial agreement, "and that said alleged antenuptial contract has never been, nor is it now, a valid, binding, or enforceable contract as against said petitioner." The judgment thereupon adjudged the contract invalid, declared that petitioner was entitled to all the rights, as a surviving widow, as though said contract had never been executed, reversed the judgment of the county court and remanded the cause, with direction to allow a reasonable sum to the petitioner for her support pending the settlement of the estate. A motion for new trial was duly filed and overruled. The record contains a written opinion by the district judge filed the day the final judgment was rendered by him.

In the county court and in the district court, what the petitioner was seeking was an allowance provided by law for the support of the widow pending the settlement of the deceased husband's estate; in both courts the executor, acting for the estate, was seeking to have such allowance defeated. The defense in both courts was that she had waived

such allowance and had barred herself from it, by virtue of the contract she had made prior to the marriage.

Alice M. Smith had two children at the time she signed the antenuptial agreement and married John J. Maag. The original agreement is in the bill of exceptions. Date and all, it is entirely typewritten, except the signatures. Omitting the certificate of acknowledgment, which is in the usual real estate form, it is as follows:

"Antenuptial Agreement.

"This agreement made and entered into this 2d day of June, 1923, by and between John J. Maag, of Otoe county, Nebraska, aged fifty-eight years, and Alice M. Smith, of Douglas county, Nebraska, aged forty-five years, witnesseth: That, whereas, a marriage is contemplated by and between the parties hereto, and the object of the pecuniary condition and situation, their prospects and desires and mutual rights and obligations, having been fully considered, they hereby mutually covenant and agree, each with the other, and to which they respectively bind themselves, their heirs, executors, and administrators as follows:

"That the said John J. Maag, in consideration of the promise of the said Alice M. Smith, to marry him, and of the consummation of the said proposed marriage, and of her agreements herein contained, covenants and agrees that he will, upon his decease, pay or cause to be paid, or provide that there shall be paid, to her, if she is then living, the sum of five thousand dollars in good and lawful money of the United States, within six months after his death; and as a further consideration thereof, the said John J. Maag, hereby waives, disclaims, and releases, all right, title and interest in and to any and all real and personal property owned or possessed by the said Alice M. Smith at the time of said marriage, or may hereafter acquire by any means whatsoever, and in which he may or might lawfully and rightfully acquire any title or interest therein or thereto by virtue of said marriage. Said John J. Maag acknowledges that he knows said Alice M. Smith

is the owner of a residence property consisting of a house and lot in Omaha, Nebraska.

"And the said Alice M. Smith, in consideration of the said five thousand dollars and of the other covenants and agreements above mentioned, hereby waives, disclaims, and releases all right, title, and interest, in and to any and all of the real and personal property owned or possessed by the said John J. Maag, at the time of said marriage, or may hereafter acquire by any means whatsoever, and in which she may or might lawfully and rightfully acquire any title or interest therein or thereto by virtue of said marriage. Said Alice M. Smith acknowledges that she knows said John J. Maag is the owner of four hundred acres of land in Otoe county, Nebraska, and a residence property consisting of a house and the north 70 feet of lots 1, 2, 3, and 4, in block 20, Prairie City addition to Nebraska City, Nebraska, and a small amount of personal property.

"The intention being hereby to leave the absolute disposal of said real and personal property now owned or hereafter acquired by either of them, so that at the death of said parties, all of the property of said parties, respectively, shall descend, or be disposed of by will, to his or her lawful heirs, legatees or devisees, released and acquitted of all claims of dower, curtesy, homestead, or other interest of any kind or nature, that either might have had under the laws of Nebraska.

"In witness whereof, the parties hereto have hereunto set their hands the day and year first above written.

"John J. Maag.<br>"Alice M. Smith.

"In Presence of C. A. Tracy.

"Stephen Hansen."

The instrument was acknowledged June 2, 1923, before C. A. Tracy, a notary. Endorsements show it was filed in the office of the register of deeds of Douglas county at 11:55 a. m. the same day and in the office of the register of deeds of Otoe county July 11, 1923, at 1:15 p. m.

Antenuptial contracts are recognized by statute. "A

In re Estate of Maag.

man or woman may also bar his or her right to inherit part or all of the lands of his or her husband or wife by a contract made in lieu thereof before marriage. Said contract shall be in writing signed by both of the parties to such marriage and acknowledged in the manner required by law for the conveyance of real estate, or executed in conformity with the laws of the place where made." Comp. St. 1922, sec. 1225.

Before entering upon the further relation of the facts and the law it may be well to state some general provisions of the law as settled in this jurisdiction.

"Antenuptial contracts between persons contemplating matrimony, determining the prospective rights of each in the property of both parties during and after marriage, are not against public policy and are enforceable;" and "In this respect, however, and before passing from this branch of the case, it might be well to state that a court of equity, when called upon to consider an antenuptial contract, should examine and construe the instrument in the light of the circumstances surrounding that particular case, and enforce or annul the agreement according to the facts disclosed in the case before it. No arbitrary rule can be laid down which would apply to all antenuptial arrangements." *Rieger v. Schaible*, 81 Neb. 33, 57.

"The burden is upon the husband, or his representatives, to show that an antenuptial contract apparently unjust to the wife was fairly procured;" and "In view of the close and confidential relation existing between affianced persons, it is the duty of the prospective husband to make a full and fair disclosure of all material facts relating to the amount, character and value of his property, so that the prospective wife may have sufficient knowledge upon which she may exercise her judgment whether she will enter into such a contract." *In re Estate of Enyart*, 100 Neb. 337.

A perusal of the antenuptial agreement shows that nowhere does it purport to disclose the value of the estate owned by either party. Nor does the evidence show that John J. Maag told Alice M. Smith at the time the contract was entered into the character or value of his property;

or that she then had knowledge of its character and value. The circumstances leading up to and surrounding the execution of that instrument, as shown by the evidence, are briefly sketched as follows: They first became acquainted in the late summer or early fall of 1922, and at Omaha, on Decoration Day, May 30, 1923, talk of marriage between them ripened into a definite agreement to be married on the following Saturday, June 2, 1923; she had never been in Otoe county, and while he had told her he owned 400 acres of land in that county he had never made any statement to her as to its location, description or value. On May 31, 1923, Mr. Maag left Omaha for his home in Otoe county, but he returned to Omaha on the evening of June 1 and telephoned Mrs. Smith from his hotel, asking her to come to the hotel to talk over a matter of business. She invited him to come out to the house and stated it was raining hard. He said he did not want to talk where so many were around and sent a taxicab for her. She went to the hotel, met him in the lobby, and went with him to his room, where they sat down on the side of the bed. She testified that he then took a paper out of his pocket and said: "I was down to Auburn this morning and had a little paper fixed up here I want to talk to you about. This is all for your protection, if anything should happen to me; if I should be taken away, you will have a home and plenty to take care of you as long as you live. I don't want you to think if you sign this I am not going to take care of you as long as you live because I am. It is just for your protection so that children couldn't take everything." She testified she never said how much it was and she did not ask him that she had not read it, nor did he furnish her a copy of it, that he did not otherwise advised her what it would be and that, as his widow, she survived him, that he took her home from the hotel that night, came the next morning and took her down to the courthouse, where the contract was signed and acknowledged and filed in the office of the register of deeds of Douglas county. She testified that she did not read the instrument, nor was it read to her. The notary

who was a deputy register of deeds and who took the acknowledgment and was one of the subscribing witnesses, testified, in substance, that because it was an unusual instrument he asked them both if they were familiar with the contents and they both answered in the affirmative. The filing was concluded at five minutes before noon; the parties went to Fremont, arriving about 4 p. m. and were there married at 7 p. m. that day.

While there was some evidence tending to impeach portions of the testimony of the petitioner, yet we find the ultimate facts are substantially as we have recited them in an endeavor to draw a fair picture of what we see in the record. Even if we were to conclude that Alice M. Smith actually read the instrument before it was executed, or that she answered the notary, when acknowledging it, that she knew its contents, yet those things, of themselves, would fall short of proving that her prospective spouse made a full and fair disclosure of, or that she knew, the extent, character and value of his holdings.

Neither spouse being the parent of the children of the other would take more than one-fourth of the real or personal estate of the other if that other died intestate. Comp. St. 1922, secs. 1220, 1222. The probate proceedings of John J. Maag had not gone far enough to show the exact value of the estate in the county court, but the inventory showed upwards of $60,000. There was evidence on the trial in the district court showing estimates ranging from $65,000 to $84,000, depending on the side producing the estimate. The petitioner if compelled to accept the $5,000 under the contract and will, rather than to be allowed to take her election under the statute, would forego at least the difference between say $16,000 and $5,000. It may be remarked that the evidence shows no appreciable change in the estate between the marriage and death. So there is a great disparity between the amount provided in the antenuptial contract and the amount the law would allow the widow. This amount is so grossly disproportionate to the interest the law would give the petitioner as to lead to the conclusion that, whether intentional or otherwise, it constituted

a legal fraud upon the petitioner. We say this without any intention of charging the deceased with active or intentional fraud. As shown in what we have hereinbefore quoted from *In re Estate of Enyart, supra,* the duty to make a fair disclosure of the amount, character and value of his property was an imperative one, cast by the law as a burden upon John J. Maag and his representatives before the validity of the antenuptial agreement can be established as a defense to the statutory right of a widow to take an allowance for support out of his estate. The same principles have been reiterated in *Stahl v. Stahl,* 115 Neb. 882, and in *In re Estate of Waller,* 116 Neb. 352.

It is argued by the executor that the petitioner, if not advised of the value of her prospective husband's estate or if ignorant of its character, extent and value, was charged with the duty of ascertaining it and yet did nothing in respect thereof. The cases we have cited from our own state show that this burden was not hers. The trial judge in his memorandum opinion succinctly covered that point with a case from another jurisdiction when he said: "But if any default or lack of duty should be charged to petitioner on that account, the law's answer to that is: 'The burden (duty) was not upon her to inquire but upon him to inform.' *Denison v. Dawes,* 121 Me. 402, and cases cited."

This case was a law case triable to a jury. *Sheedy v. Sheedy,* 36 Neb. 373. The executor now claims that it was converted by her reply (in the district court) to an issue in equity. It would seem a complete answer to this to say that the record shows that the parties waived a trial by jury. We do not find any place in the record where the question that it was an equity trial was discussed or referred to. Moreover, the issue in the county court seems to have been whether or not the widow was entitled to an allowance. Incidentally it depended as a matter of evidence upon whether she had waived it by her antenuptial contract, and the county court found that she had done so because the contract was valid. In the district court the issues had to be the same and were so; and again the con-

tract was pleaded as a defense. The district court held that the contract was not entered into in the circumstances required by law and was invalid and therefore not a bar to her allowance. It is true the petitioner in her reply in the district court prayed for "such other and further relief," but this could not convert a law case into an equity case. It was mere surplusage. While we are of the opinion it is purely a law case, yet we have no hesitancy in saying that if it were an equity case we would still, having gone very carefully into all the evidence, have found the ultimate issuable facts the same as did the trial judge.

In discussing such contracts, Judge Letton in the opinion in the *Enyart* case said: "In fact, most courts now support antenuptial contracts if fairly made. Such instruments frequently tend to peace and happiness by settling questions concerning rights of property, which, especially in the case of marriage of people in later life having children of a former marriage, often furnish grounds of irritation and friction which may defeat the very purpose of the union." To this philosophy, so aptly phrased, we think it not out of place to add a few observations, derived from a realization that there is an increasing number of those adopting this method of providing in advance of marriage for the distribution of estates after death. And yet such lay parties and, perhaps, to a lesser extent, the members of the profession who are sometimes, but not always, consulted, do not in all instances realize, or at least put into practice, the elements that form the basis of a valid antenuptial contract. The ideal contract of that nature would be preceded not only by a full and frank disclosure of every item of real and personal property but by an examination to discover and perpetuate the evidence of its quantity, character and value. If this were done and these things were set forth in the instrument itself, together with evidence that the parties knew what relation the provisions of the contract bore to the statutory rules of distribution, there would be less opportunity for litigation by a surviving spouse. If, in addition to what has been suggested, frank effort would be made by both parties to

secure and preserve evidence of third parties as to all the circumstances of the disclosure, the chances for future disagreement would be reduced to a minimum. It could not then be said, as it was said in *White v. White,* 112 Neb. 850, and as appears in the instant case: "She was too much hurried into it." An antenuptial contract means what the words signify. It has to be entered into before marriage. If valid, it cannot be changed after marriage. Whether valid or invalid, if entered into in haste it is often repented at leisure, sometimes by one party, sometimes, as in case of divorce, by both.

We believe the judgment of the district court is the proper one on the particular facts and the law of this case, and it is, therefore,

AFFIRMED.