LILLIE J. KINGSLEY ET AL., APPELLANTS, V. CLARA E. NOBLE ET AL., APPELLANTS: MARY E. KLONE, APPELLEE.*

FILED MAY 17, 1935. NO. 29170.

*Opinion vacated. See p. 808, post.

*G. M. Spurlock* and *W. W. Wyckoff,* for appellants.

*Sandall & Webster, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, DAY, PAINE and CARTER, JJ., and CHASE, District Judge.

CHASE, District Judge.

This is a suit in partition which involves the validity of an antenuptial agreement entered into between the testator and his prospective wife. The trial court found the contract to be null and void; recognized the widow's election to take under the law; and found that she had an undivided interest in the estate of the deceased notwithstanding the contract; but charged her interest with the payment of $2,000, a sum which she had received for some land conveyed to her in consideration of the contract.

From the finding that the contract is null and void, the plaintiffs and all of the defendants except the widow appeal, and from that part of the decree charging the widow's estate with the payment of $2,000, the widow prosecutes a cross-appeal.

The facts are substantially as follows: Hermon H. Klone, the testator, and the defendant Mary E. Klone, were married on the 4th day of August, 1915. The testator at that time was 72 years of age, and his widow was then 56. This was the testator's third marriage. He had a number of children by the first marriage and a number by the second marriage. His second wife died in 1915, some three months before this marriage. During the active years of his life he pursued the occupation of a farmer, and through industry and economy was able to accumulate quite a substantial estate, most of which consisted of real property. He had retired from the farm and had been living in the city of York as a retired farmer for some time before his third marriage, and continued to live in York until the time of his death. Mary E. Klone, before her marriage to the testator, had been previously married in the state of Illinois. Subsequently, with her husband and family, she moved to York county, where her husband, a tenant farmer, died about the year 1901, leaving her with some small children and practically no estate. After her husband's death she moved with her family to Omaha, where by labor and saving she kept the family together, giving the children an opportunity for education until nearly all had reached maturity and some had married. Some of her children, in the meantime, had moved to York and Polk counties. Later she left Omaha and made her home with her children, spending most of the time with a daughter near Polk, Nebraska. Immediately previous to her marriage with the testator, she was staying with her married daughter, Mrs. Brott, in York, and while at the Brott home she met the testator, which acquaintance, within a very short time, culminated in marriage.

The testator appears to have been a farsighted, shrewd

and successful business man, capable not only of producing wealth but safeguarding it against loss or dissipation. When his marriage with this defendant became imminent, presumably in order to preserve his estate intact for his children, on his sole initiative, he procured a very skilful and prominent lawyer to prepare for him the antenuptial contract involved in this proceeding. He had informed his lawyer of his matrimonial intentions and plan to retain his estate subject to his control and disposition. This all occurred some days previous to the date of the marriage. Pursuant to his desires the contract in question was drafted. It bears evidence of the skill of the draughtsman, being worded and phrased with the precision of a common-law indictment. It is as follows:

"These articles of agreement, made in duplicate at York, Nebraska, this 4th day of August, 1915, by and between Hermon H. Klone, a widower at the age of 72 years and a resident of York county, Nebraska, party of the first part, and Mary E. Downey, a widow of the age of 56 years and a resident of Polk county, Nebraska, party of the second part, witnesseth:

"For, that, whereas a marriage is shortly intended to be had and solemnized between the said parties; and whereas the first party is the owner of a quarter section of land in Washington county, Colorado, of the value of about $1,500, and also of about four hundred acres of farm land in York county, Nebraska, of the value of about $60,000, and also of a homestead estate together with an undivided one-third interest in the fee of a certain dwelling-house and the land upon which it is situated in the city of York, Nebraska, of the value of about $3,000, and also grain, live stock and household and other chattel properties of the aggregate value of about $5,000:

"And, whereas, the first party accumulated said property in the past with the aid and assistance of his first wife and his children by her, and which the second party has had no part in accumulating, and which, together with the hereafter acquired property of the first party, it is hereby agreed and understood should and shall in justice and

propriety and as a matter of antenuptial contract between the parties, with the exception only of said quarter section of land in Colorado, go to the other heirs of the first party, and to his devisees, grantees and vendees as he shall choose and elect wholly divested of any and all right, interest or estate of the second party therein by reason of her marriage with the first party, and which it is hereby understood and agreed by the parties hereto shall be and remain at all times hereafter in the exclusive, several and separate control and ownership of the first party in all respects the same as though he had remained and were an unmarried person:

"And, whereas, the children of both the parties are all of them adults and the parties do not wish to be under the necessity of seeking a home and companionship in the homes of any of their children, they, the parties hereto, contemplate said marriage for the sole purpose of establishing a home of their own wherein they may have the convenience, comfort and companionship of each other, but they do not, by said marriage, intend to endow or confer upon each other any of the usual interests, estates and marital rights in the property and estate of each other:

"Now, therefore, in consideration of the premises and of the conveyance by the first party to the second party of said lands in Colorado, to wit: The northwest quarter of section twenty-eight (28) in township three (3) north, range fifty (50) west of the sixth principal meridian in Washington county, Colorado, the receipt of which conveyance is hereby acknowledged by the second party, it is agreed that if the intended marriage shall take place and effect, that during the married life of the parties hereto, all the property of the first party, which he now has or hereafter may acquire, both real, personal and mixed and wheresoever situate, shall be held and owned by him separately and severally in all respects as though he were an unmarried man, and wholly divested of all rights, interests and estates of the second party by reason of her marriage with him, and that the second party shall and

will permit and suffer the first party to give, grant and dispose of his said property which he now has or hereafter may acquire, or any part thereof, as he shall see fit in his lifetime, and to make such will, conveyance or other writing as aforesaid as he may desire, and thereby to give, convey, devise or limit his said property, or any part or parts thereof, to any person or persons, for any use, trust, intent or purpose whatsoever, and if necessary to satisfy the requirements or demands of the first party's vendees and grantees, the second party will and shall, whenever requested or required by the first party, join with him in the execution, acknowledgment and delivery of all such deeds, conveyances, mortgages, bills of sale, and all other writings concerning said property, or any part or parts thereof, as the first party may require.

"It being the spirit and intent of the contract to give to the first party, after such marriage, full and complete control over his said property which he now has or hereafter may acquire, with power to sell and dispose of the same, or any part or parts thereof, without let or hindrance from the second party, and that upon the death of the first party, the second party shall not have, take or inherit any of the property of the deceased, or have any interest or right by way of dower, homestead or award, or by reason of the statutes of descent and distribution, or by reason of said marital relation, in or to the same or any part thereof, but the said property shall, in default of a will, go and descend to the other heirs of the first party the same as though the second party had never been his wife.

"And the parties sign and deliver this instrument simultaneously with the delivery by the first party to the second party of a due conveyance to her of said Colorado lands, in the presence of H. G. Hopkins and W. L. Kirkpatrick, and after this contract has been carefully read and explained to the parties, and each of them, by the said H. G. Hopkins who is not of counsel for either of the parties nor interested in this contract, but who has read and explained it and signed it as a witness at the request of the parties.

"In the presence of

"W. L. Kirkpatrick            Hermon H. Klone

"Harry G. Hopkins           Mary E. Downey.

"State of Nebraska, York county—ss:

"On this 4th day of August, 1915, before me, Harry G. Hopkins, the duly elected, qualified and acting county judge in and for said county, came Hermon H. Klone and Mary E. Downey, to me personally known to be the identical persons described in and whose names are affixed to the foregoing instrument as the makers thereof, and they severally acknowledged said instrument to be their voluntary act and deed and the voluntary act and deed of each of them.

"Witness my hand and the seal of the county court of York county, Nebraska.

"Harry G. Hopkins, County Judge.

"(Seal County Court of York county, Nebraska.)"

On the day before the marriage, Mrs. Klone was staying with her daughter at Polk, Nebraska. The testator on that day went from York to Polk, where he stayed overnight, and while there it was arranged between the parties that they should be married on the following day at Seward, Nebraska. They left Polk on an early train, and while on the train between Polk and York the testator, for the first time, informed his prospective wife that he desired to stop in York to have some papers executed, without informing her of the purport thereof. The testator was the owner of a quarter section of land in Colorado, and he told her, while on the train, that he wanted to deed this land to her, but, according to her testimony, said nothing as to any other instruments that he proposed to have executed. They arrived at the lawyer's office in York shortly after noon on the wedding day. While there the antenuptial contract was produced, hurriedly read to the widow and executed. Only about fifteen minutes were consumed in the whole matter. The contract was prepared and ready for execution some time before the wife knew anything about its existence. She had no opportunity of employing or advising with counsel as to her rights, and had little or no

knowledge of a wife's interest under the law in the property of the husband.

The parties lived together as husband and wife from the marriage until the husband's death; which occurred in 1933. The husband executed a will, which was duly probated, but the widow filed her election to take under the statute. In the will he made a bequest to her of $1,500.

The lawyer who drafted the contract testified that it was read to the parties by the county judge before signature. The county judge testified that he had no recollection whatever of reading the contract to the parties. The widow testified in one place that she thought she knew what interest she would take under the law in case of marriage, but was not informed or told by anybody that day what her interest would be. Later she testified that she knew nothing of what interest in the husband's estate the law gives the wife in case of his death, and had no information upon that subject until after the contract was signed.

Antenuptial contracts have been before this court for consideration on a number of occasions. The attitude of the courts, not only in this state, but elsewhere, seems to be that no definite rule can be adopted applicable to all such agreements; that each contract must stand or fall according to the particular facts and circumstances surrounding it. However, the courts hold that certain things are essential to support the validity of these contracts: First, they must be fairly entered into; second, the terms must be just and reasonable; third, the property provided for the prospective spouse must bear a just and reasonable proportion to the estate of the prospective husband; fourth, the husband must make a full disclosure as to his property. *In re Estate of Enyart*, 100 Neb. 337; *In re Estate of Maag*, 119 Neb. 237. It is lawful under our statute for parties, before marriage, to enter into a contract to bar the respective rights in the property of each other. Section 30-106, Comp. St. 1929, provides:

"A man or woman may also bar his or her right to inherit part or all of the lands of his or her husband or

wife by a contract made in lieu thereof before marriage. Said contract shall be in writing signed by both of the parties to such marriage and acknowledged in the manner required by law for the conveyance of real estate, or executed in conformity with the laws of the place where made."

Equity, in construing these contracts, looks beyond the mere terms thereof and takes into consideration the atmosphere and surroundings under which the contract was entered into. No doubt the reason equity regards the rights of the parties so jealously under the circumstances is because of the peculiar relationship that exists between them. In the whole realm of human relations we are aware of no incident where more trust and confidence exists than when two parties agree to enter into the matrimonial state. Especially does a woman place all her faith in the honor and affections of the man in whose keeping she is about to deposit her future happiness. From him she ordinarily keeps no secrets, and she believes he withholds none from her. While under the influence of such ecstatic anticipation, she is quite often deprived of the normal ability to provide for her future security, or to insist upon the preservation of her full legal rights. The law views the institution of marriage as a thing too sacred to be regarded as an article of commerce upon a bargain counter or the subject of barter and sale, in which parties deal at arm's length. The legal effect of contracts of this character cannot be ascertained by fixed and definite rules of interpretation, or their scope determined by any common method of measurement.

"Owing, moreover, to the confidential relation which subsists between the parties, an antenuptial contract which appears to have been unfairly procured, will be set aside; and one whose terms are grossly inequitable, especially if involving unreasonable sacrifice of the wife's rights, can only be sustained upon very clear proof of concurrent intent." Schouler, Husband and Wife, sec. 360.

In antenuptial contracts a provision for the benefit of the wife "should be characterized by the utmost good faith,

free from fraud on the part of the husband, and the provision for the wife should be reasonably proportionate to the means of the husband. If these essentials are lacking, the settlement may be set aside in equity. The parties to an antenuptial contract do not deal at arm's length, but they occupy a confidential relation to each other, and while they may lawfully contract with each other, when there is full knowledge of all that may materially affect the contract, yet if the provision secured for the intended wife is disproportionate to the means of the intended husband, it raises a presumption of fraud or concealment, throwing upon those claiming in the husband's right the burden of disproving the same." Tiffany, Persons and Domestic Relations, Hornbook Series, sec. 86.

The rule applicable to the construction of contracts of this character makes it incumbent upon the husband or his representatives to show that an antenuptial agreement, apparently unjust to the wife, was fairly procured. *In re Estate of Enyart, supra; In re Estate of Maag, supra.* By the appraisement the testator placed upon his property in the contract, his estate was then of the value of $69,500, of which, in consideration of the wife entering into the same, he gave her the Colorado land valued at $1,500. She was, by a designing husband, hurried into this arrangement, having little or no knowledge of what her rights would be under the law in case of marriage. The provision made for the wife, according to the valuations put in the contract, is slightly more than one forty-sixth of his estate. This amount, as we view it, was so grossly disproportionate to the value of his entire estate as to make the contract unjust.

The representatives of the testator having failed to assume the burden of establishing that the contract was fairly procured, the same is therefore ineffectual to bar any rights of inheritance on the part of the wife. In so far as the validity of the contract is concerned, the case is affirmed.

As to the matters presented by the cross-appeal, it appears that the widow sold the Colorado land for $2,200,

part of which was used during the marriage relation by herself and husband to satisfy obligations that the law would cast upon the husband, thus relieving him from the payment thereof. It appears further that there remains as a balance from the original consideration of the Colorado land to the credit of the widow the sum of $1,160. Since the wife challenges the validity of the contract under which she originally acquired the $1,160, equity will not permit her to retain any moneys derived therefrom. In equity a party will not be permitted to affirm a contract as to a part beneficial to such person and disaffirm as to a part detrimental. Her estate, therefore, should be charged with the payment of $1,160. With this modification of the case presented by the cross-appeal, the same is

AFFIRMED AS MODIFIED.

CARTER, J., dissenting.

The record in this case shows that the deceased, Hermon H. Klone, died on January 5, 1933, leaving a will in which he disposed of all of his property. Lillie J. Kingsley, a daughter of the deceased, brought this suit to obtain a partition of the real estate devised by the will. Mary E. Klone, the widow of the deceased, filed an answer alleging that she had elected not to accept the provisions of the will and to take under the statute. The reply sets up the antenuptial contract as a bar to her claim of right under the statute, which contract is set out in full in the majority opinion in this case. Mary E. Klone filed a pleading denominated a reply to the reply in which she alleged the antenuptial contract to be void and of no force and effect for the reason that the same is unconscionable, unfair, inequitable, fraudulent, and not honestly and fairly made. From a decree holding the antenuptial contract to be null and void, the case was brought to this court for review.

The appellee was the third wife of the deceased and was not the mother of any of his children. The deceased had seven children by his first wife and seven by the second. At the time appellee married the deceased, she was 56 years of age and had four children by a former marriage. The deceased was 72 years of age at the time of his mar-

riage to appellee on August 4, 1915. The evidence shows that appellee was without means of support at the time of her marriage to Klone except for her ability to work as a housekeeper. She testifies that she first met Klone at the home of one H. W. Brott who recommended Klone to her as a prospective husband. Appellee testifies Klone called on her at least four times prior to their marriage. On the day of the marriage, Klone and his prospective wife stopped at the office of W. L. Kirkpatrick in York, Nebraska, where the contract in question was executed. At the same time a deed was executed by Klone to appellee conveying a quarter-section of Colorado land.

The evidence other than the statement contained in the antenuptial contract itself, as to the circumstances surrounding the execution of this agreement, is very conflicting. It shows that W. L. Kirkpatrick, the attorney who drew the contract, was present, and H. G. Hopkins, the county judge of York county, was also called in. These were the only persons present other than the contracting parties.

W. L. Kirkpatrick testified in substance as follows: That he had prepared the antenuptial contract and the deed to the Colorado land as attorney for Hermon H. Klone; that H. G. Hopkins, the county judge of York county, was called in to take the acknowledgments, which he did; that Judge Hopkins read the contract to the appellee before she signed it; after the reading, she was asked if she desired to ask any questions, to which she replied, "It isn't necessary, that's the agreement I have with Mr. Klone, anyhow I understand it;" that the contract was then signed, witnessed, acknowledged and delivered; that the deed to the Colorado land was executed and delivered to appellee at the same time and the transaction closed. The testimony of Kirkpatrick is that he is confident, but not positive, that it was explained to appellee the interest she was relinquishng in Klone's property.

The testimony of Judge Hopkins was to the effect that he witnessed and acknowledged the contract, but that he could not recall the conversations that took place at the

time, or whether or not he had read the contract to the appellee.

The testimony of appellee was that she was told that she was to sign a deed to the Colorado land that Klone was conveying to her; that she did not understand what the transaction was; that the contract was not read by any one to her; that she did not know the extent of Klone's property or the interest she relinquished therein, and that Klone had never talked to her about such an agreement until they were in Kirkpatrick's office.

It is further disclosed by the record that after the execution of the contract the appellee was given a copy. She admits that she had it several months and read it over many times, but made no complaint to any one until the lips of her husband were sealed by death more than 17 years later. Two years after her marriage, and after being fully acquainted with the provisions of the antenuptial contract, she conveyed the Colorado land and kept the proceeds in a bank in her own name. The evidence also shows that, shortly before the death of Klone, the appellee and one Elenor Aiden took him to the bank and attempted to get possession of the antenuptial contracts for the purpose of destroying them. The bank officers, because of the then physical and mental condition of Klone, refused to turn the papers over, and, in lieu thereof, called Klone's attorney who efficiently protected his interests.

That the deceased made a fair disclosure of his property in the contract cannot be denied. The Colorado land was valued therein at $1,500 and it was sold two years later by the appellee for $2,200. The total assets of the deceased were valued in the contract at $68,000 and they were appraised when his estate was probated in the sum of $35,986.88. The record also shows that appellee received $1,000 from the deceased some time after their marriage which she put into a home that she now owns. In addition thereto, she received $1,500 and all of his household goods and furniture, except a piano and one bed, under the provisions of his will. In addition to all of this, she was provided for until Klone's death in a home which

appellee admits was very comfortable. Under this statement of the evidence, did the trial court err in declaring the antenuptial contract null and void? I am of the opinion that he did.

The right to make an antenuptial contract is granted by statute. Comp. St. 1929, sec. 30-106. That the marriage of the contracting parties was a sufficient consideration is not disputed. There is no question but what the deceased made a full and fair disclosure as to the extent of his property in the contract itself. The contention of the appellee that the contract was not read and that she did not understand it is without merit, in my opinion, in the light of all the evidence. The evidence of Kirkpatrick is that it was read and explained to her. Hopkins does not dispute the testimony of Kirkpatrick, though his evidence is of little help. The evidence shows, however, that Hopkins was a friend of the appellee of long standing and that she had absolute confidence in him. The deceased had never met him before. This is at least an indication that Klone was fairly and honestly making the contract, and that he was not the grasping and designing husband that the appellee would have the court believe him to be. Her subsequent action in examining the contract and making no complaint is consistent with Kirkpatrick's testimony that she said, at the time of the execution of the contract, when asked if she had any questions to ask, "It isn't necessary, that's the agreement I have with Mr. Klone, anyhow I understand it." It is to be borne in mind that these contracting parties had met only four times prior to their marriage. Apparently the intention of each was to procure a home without the necessity of imposing on their respective children in their declining years. That the contract was a strict business proposition and not made while the appellee was under the influence of any "ecstatic anticipation" is fully borne out by the record. Can it be said that, if the deceased had lost all of his property after this marriage and prior to his death, this contract could have been set aside on the part of the heirs of the deceased? Any court would hold that it was a valid contract

made for the protection of the widow under those circumstances. Have we reached the point in our jurisprudence where a widow may successfully elect whether she will take under an antenuptial contract or under the statute? Such would seem to be the import of the holding of the majority opinion. Two previous wives and fourteen children by them helped to accumulate this property. The deceased had a right to take this into consideration in making the contract in question. Under such circumstances, the wife is not in a position to demand such a large proportion of his estate as she might if there were no children or no previous wives. I am convinced, under the evidence and circumstances of this case, that the amount given appellee therein was not so disproportionate as to void the contract or place the burden of proof on the deceased and his representatives to uphold its fairness. This conclusion is supported by the recitals in the contract itself, over the signature of the appellee, which show that the contract was honestly and fairly entered into and that she was properly advised of her legal rights. This being true, it becomes the duty of this court on a trial *de novo* to reverse the holding of the trial court.

It might be said that the contract is void for the reason that it was not explained to appellee the interest she was relinquishing in Klone's property. It will be borne in mind that a full and fair disclosure of the extent of Klone's property was made to appellee. Under such circumstances, there is no requirement that appellee be advised as to the value of the rights relinquished. This is the law in many jurisdictions, including our state.

In *Robbins v. Robbins,* 225 Ill. 333, it was said in the opinion: "It is conceded by counsel for complainant that she was fully informed as to the amount of property owned by her prospective husband and of every fact and circumstance material to the contract, but he contends that she is entitled to avoid it because she was not fully and correctly informed as to her legal rights. She had full information as to the property of Robbins and there was no actual fraud inducing her to execute the contract. Mrs.

Bennett told her that if she did not sign the contract she would get nothing, but this information was given through ignorance of the law. None of the parties knew that the marriage would revoke the will of Robbins and there was no actual fraud inducing her to execute the contract. * * * Robbins died in the belief that the will was valid. After his death probate of the will was refused because it had been revoked by the marriage. Mere ignorance of the law in that respect would not be sufficient to avoid the contract."

In the case of *In re Estate of Enyart,* 100 Neb. 337, the case relied upon in the majority opinion, it was held: "Where the provision made for the intended wife by an antenuptial contract is grossly disproportionate to the interest in the prospective husband's estate which the intended wife would acquire by operation of law in case a marriage took place, the burden rests upon those claiming the validity of the contract to show that a full and fair disclosure was made to her before she signed it of the extent and value of the property, or that she was aware to all intents and purposes of the nature, character and value of the estate which she was relinquishing if the marriage took place." It will be noted that the rule therein set out is in the alternative. A full disclosure of the property of the husband must be made *or* she must be informed of the nature, character and value of the estate she relinquishes. This is on the theory that if she is acquainted with the facts she is presumed to know the law applicable thereto. Having concluded that the appellee was fully advised of the nature and extent of Klone's property at the time the contract was made, there was no necessity, in order to uphold the contract, to explain the nature and value of the rights relinquished in the absence of evidence that she was fraudulently misled as to the law.

This contract should be upheld on the theory of an estoppel. The appellee remained silent for over 17 years after knowing all the facts. The husband died in the honest belief that it was a binding contract. He made additional provision for her by gift and in his will. The

appellee accepted and retained the property obtained by the contract. She waited until the death of her husband before she ever voiced any objection of any kind with reference to the contract. Might it not be reasonably supposed that the stilling of the husband's voice was necessary before appellee could prove the semblance of a case? "A party cannot accept and retain the benefits of a contract of marriage settlement and at the same time maintain an action based upon the ground of its invalidity." 30 C. J. 663.

In *Erb v. McMaster*, 88 Neb. 817, this court said: " 'The parties not only intermarried pursuant to the contract, but, as long as the wife lived, both she and her husband, the plaintiff, believed they had a valid contract, and acted upon and treated it as such. The wife lived and died in that belief, and paid out her money and made her will accordingly. Plaintiff accepted $330 of her money, and gave a written receipt acknowledging that he received it on said contract, and still keeps and retains said money and makes no offer to return it. It was not until his wife's death that he doubted the validity of the contract, which he wrote with his own hand. The court is of the opinion that good faith and common honesty require that he should still abide by the contract, now that she is dead. In good conscience he is estopped to do otherwise. The part performance which will take an oral contract out of the statute is such conduct as will amount to an equitable estoppel against the party who would resort to the statute to defeat the oral agreement. *Brown v. Hoag*, 35 Minn. 373; 4 Pomeroy, Equity Jurisprudence (3d ed.) sec. 1409. Plaintiff's wife, relying upon the antenuptial agreement, married the plaintiff, paid a large sum of money to plaintiff, which he otherwise would not have received until after her death, made her will disposing of the rest of her property to those whom she desired to have it, and then died, thus putting it out of his power to put her in the position that she would have occupied had he not induced her to do such things, relying upon said contract; and, while admitting the contract, he now seeks to repudiate it.

by invoking the statute of frauds. It seems to me it would be a fraud upon the dead as well as the living to permit him to do so.' No offer is made in the petition to return to the personal representative of the deceased (who is a party to the suit) the money paid on the contract. A tender was made at the argument in this court, which was too late to be effectual. Mrs. Erb disposed of her property and died with the knowledge that plaintiff had accepted the benefit of the contract by the receipt of the money paid him thereunder. She cannot change this disposition, and the other party should not be permitted to do so. The money was paid plaintiff in lieu of his interest in the real estate, and its acceptance and retention bars him in equity. Even if the contract were wholly invalid, which we do not decide, under these circumstances, the plaintiff is estopped to allege its invalidity." This holding was cited with approval in *Eberhart v. Rath,* 89 Kan. 329. We believe these cases to be controlling in the case at bar.

It will be borne in mind that there is no evidence in the record showing a rescission of the contract and tender of the benefits received under it. In fact, the appellee by her cross-appeal is still claiming the funds obtained as a part consideration for the contract. In my opinion the appellee is estopped from claiming the antenuptial contract to be null and void.

Under the evidence and circumstances of this case, I can perceive no reasons of public policy why this contract should not be enforced. Public policy almost demands that it should. The court in *Stilley v. Folger,* 14 Ohio, 610, in discussing a like case, said: "Antenuptial contracts have long been regarded as within the policy of the law, both at Westminster and in the United States. They are in favor of marriage and tend to promote domestic happiness, by removing one of the frequent causes of family disputes, contentions about property, and especially allowances to the wife. Indeed we think it may be considered as well settled, at this day, that almost any *bona fide* and reasonable agreement, made before marriage, to secure the wife in the enjoyment either of her own separate property, or

a portion of that of her husband, whether during the coverture or after his death, will be carried into execution in a court of chancery. Though, for many purposes, by the marriage, the legal existence of the wife is merged in that of her husband, the law recognizes her legal and separate identity and her separate rights; and she may preserve the one and enforce the other, in contracts of this character." The Illinois court, in the case of *McGee v. McGee,* 91 Ill. 548, stated the situation in the following language: "The contract, in our judgment, is a reasonable one. It is one that persons advanced in life could, with great propriety, make, and especially where the parties have previously been married, and where there may be children by both marriages, among whom controversies as to property may arise after the death of the parents. Such agreements are forbidden by no considerations of public policy, and there can be no reason why equity will not lend its aid to compel the surviving party to abide the contract. Our opinion is, the fair construction of the antenuptial agreement is, that it intercepts dower of the widow, and may be set up as an effectual bar to her demand for dower in the lands of which her husband died seised." Both of the above cases were cited with approval by this court in *Rieger v. Schaible,* 81 Neb. 33. In my opinion, the reasoning contained in these authorities sustains the contentions of the appellants in the case at bar.

For the reasons herein stated, the antenuptial contract set out in the majority opinion should be enforced. If this contract cannot be upheld after considering all the facts and circumstances of the case, section 30-106, Comp. St. 1929, might as well not have been written; it has become ineffective by judicial rules and the will of the legislature has been defeated.

ROSE, J., concurs in the above dissenting opinion.

PAINE, J., dissenting.

I fully concur in the above dissenting opinion. The antenuptial contract set out in the main opinion in this case is in model form, was carefully drawn, and deals fairly

with both parties under all the circumstances disclosed. Having the parties execute it before the county judge, supposed to be impartial in the matter, was an added precaution, in the hope that its validity would be unquestioned. An old man, marrying his third wife after only four social calls, doubtless felt a moral duty to protect the many children of his two marriages in the rights which they had in his property accumulated in part by the assistance of the older children.

In general, the purpose of a marriage settlement, as I view it, is that before the marriage the parties may, with some deliberation, decide and settle what the rights of each shall be in the property respectively owned by each of them. By such an agreement a prospective wife, who longs for a home and the companionship and protection of a successful man, may well decide that property is but an incident, and not the primary purpose of her approaching marriage, and may wisely enter into an agreement which will convince the adult children of former marriages that she is not what is spoken of in common parlance as a "gold digger," but that she is anxious merely for a happy home and comfort. The family relationships may be far more pleasant under such conditions, and it is not unusual for such a prospective wife to be willing to take far less than what might be an exact mathematical division founded on cold, legal rights.

A wife may, and often does, convey to her husband all of her property; why should it be deemed fraudulent if a prospective wife is modest in her demands upon his property in an antenuptial contract?

The consideration for such forbearance is the marriage, which may be desired above all else by a widow, and is a consideration of the highest value in law. From the earliest times it is said that courts look with favor upon such contracts (*Neves v. Scott*, 9 How. [U. S.] 196), yet, in these later times, it seems almost impossible to have one approved by our supreme court; it appears strange that, in the opinion of the majority of this court, lawyers should fail, in case after case, in drawing these contracts.

The main opinion appears to consider chiefly the property interests involved, and to be concerned with whether the amount of property reserved to the intended wife is "grossly disproportionate" to what she might have secured under the law.

Our court has held that, if it is fairly and equitably made, and entered into in good faith, it will not be disturbed after the death of one of the parties. *Neneman v. Rickley,* 110 Neb. 446. See *Rieger v. Schaible,* 81 Neb. 33, 16 Ann. Cas. 700; *Erb v. McMaster,* 88 Neb. 817; *In re Estate of Maag,* 119 Neb. 237.

I insist that in the case at bar there was no romance whatever; an old gentleman, with many children by two marriages, wanted a housekeeper; a mutual acquaintance brings them together; she had been working out in different families, and had found that housekeeping for hire was drudgery, and dependence upon her children had its drawbacks, and she wanted a home.

Seventeen years later, after he had faithfully carried out his part of the contract, and had died, she discovers that the antenuptial contract was a fraud upon her rights.

Equity and good conscience ask, why did she not attempt to set it aside while her husband was still living and could have protected the rights of his children and grandchildren?

I insist that other considerations, rather than a purely mercenary view of money and lands, may in some cases be the controlling motive, and the survivor should be held to abide by an antenuptial contract fairly and legally made.