EMMA WULF, APPELLEE, V. WILLIAM H. WULF ET AL., APPELLANTS.

FILED MAY 24, 1935. No. 29277.

*Baldwin & Baldwin* and *Sloans, Keenan & Corbitt,* for appellants.

*P. I. Harrison, Walter C. Weiss* and *Hall, Cline & Williams, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

ROSE, J.

This is an action by Emma Wulf, plaintiff, for the partition of 410 acres of land in Thayer county, near Deshler, of which her husband, Henry Wulf, died seised September 21, 1932, without leaving a will. The action was commenced April 14, 1933, while the estate of decedent was in the course of settlement; William H. Wulf being administrator. Intestate, Henry Wulf, in addition to plaintiff, his widow, left surviving him William H. Wulf and Albert F. Wulf, sons, and Alma Wulf and Clara Wulf Ehlers, daughters. These sons and daughters were adult children by the former wife of decedent. Henry Wulf was the third husband of plaintiff. She was not the mother of any of his children, but had three living children of her own as the issue of her first marriage. The sons and daughters of decedent are defendants. The administrator, the wife of William H. Wulf, the wife of Albert F. Wulf, and the husband of Clara Wulf Ehlers are also defendants.

Plaintiff claims an undivided one-fourth interest in the 410 acres of land described in her petition and that each of decedent's sons and daughters is entitled to three-sixteenths thereof. The relief sought by plaintiff depends upon the invalidity of an antenuptial contract, a copy of which follows:

"Antenuptial Contract

"This agreement made and entered into on this 24th day of December, 1927, by and between Henry Wulf, a

widower, of Deshler, Thayer county, Nebraska, and Emma Harms, a widow, of Deshler, Thayer county, Nebraska.

"Witnesseth: That the parties to this contract have agreed to become man and wife and each of said parties have property and heirs at law and that each of them desire to keep their own property in their own name and that the separate property now owned by each of them shall descend to the lawful heirs of said parties just as it would *to* had this intended marriage not been contracted.

"It is hereby agreed by each of said parties that in case the said Henry Wulf shall depart this life leaving the said Emma Harms a widow that she shall have his town property valued at about $5,000 located in Deshler, Nebraska, being the home of the said Henry Wulf.

"It is further agreed that no part of the property belonging to either of the parties hereto shall descend to the other except the homestead hereinbefore described and each party to this contract hereby releases all estate, personal property and real estate belonging to each other and waives any claim that either of them might have on the property of the other and that the property of each of them shall descend to their respective heirs except the town property which is especially given to Emma Harms.

"This agreement shall be binding upon the executors, administrators and heirs of each of the parties hereto.

"Witness our hands and seals the day and the year last above written.

"In the presence of:

"J. P. Baldwin                    Henry Wulf
"Doris McDonald                Emma Harms."

This contract was signed by the parties to it, acknowledged by them before a notary public and officially recorded December 24, 1927. Its validity was put in issue by formal pleadings.

Upon a trial of the cause the district court canceled the antenuptial contract as void, confirmed in plaintiff title to the undivided one-fourth of the land in controversy as her share under the statute of descent and ordered a partition as prayed in her petition. Defendants appealed.

Propositions argued by plaintiff in support of the decree canceling the antenuptial contract which she made with Henry Wulf before they were married may be summarized for the purposes of a trial *de novo,* as follows: The provision made for her was grossly disproportionate to the amount she would have received from his estate under the law, if the antenuptial contract had not been made. She was not aware of the nature, character and value of the estate she was relinquishing when entering into the antenuptial contract. A full and fair disclosure of the character, extent and value of Henry Wulf's property was not made before she signed the agreement. It was obtained by concealment and actual fraud. The burden was on the persons relying upon the validity of the antenuptial contract to prove that a just and fair disclosure was made to plaintiff before she signed it.

On the other hand, defendants contend that there was no evidence of such gross disproportion as to cast on them the burden of proving a full, fair and timely disclosure of the value, extent and character of decedent's property; that the antenuptial contract should not be set aside in equity without competent evidence that a full and fair disclosure of the extent, character and value of the property was not made; that the written instrument should not be canceled without competent evidence that plaintiff was not aware to all intents and purposes of the nature, character and value of the estate relinquished by her in the event of marriage; that invalidity of the contract was not proved; that it is valid and prevents partition at the suit of plaintiff.

The validity of an antenuptial contract depends upon the circumstances of each particular case. The rule in equity has been stated as follows:

"A court of equity, when called upon to consider an antenuptial contract, should examine and construe the instrument in the light of the circumstances surrounding that particular case, and enforce or annul the agreement according to the facts disclosed in the case before it. No arbitrary rule can be laid down which would apply to all

antenuptial arrangements." *Rieger v. Schaible,* 81 Neb. 33, 57. Followed in *In re Estate of Enyart,* 100 Neb. 337.

In the light of the circumstances surrounding this particular case, as shown by a preponderance of the evidence, does equity require the cancelation of the antenuptial contract? The agreement into which the parties entered does not on its face create any suspicion of fraud. Each party had real estate to protect from the heirs of the other. The contract was mutual. Courts of equity have sometimes exalted the antenuptial contract as a benign aid to domestic happiness. In a case upon which plaintiff relies to sustain her position the supreme court said:

"Such instruments frequently tend to peace and happiness by settling questions concerning rights of property which, especially in the case of marriage of people in later life having children of a former marriage, often furnish grounds of irritation and friction which may defeat the very purpose of the union." *In re Estate of Enyart,* 100 Neb. 337.

The rules of equity applied in that case were not intended to create an easy method of destroying such a contract, without substantial reasons, after death has terminated the marriage relation.

Plaintiff and Henry Wulf were engaged to be married before they executed their antenuptial contract. He was about 62 years of age and she was past 50. He had four adult children by a former wife and she had three by her first husband. The contracting parties were farmers residing in the same neighborhood. He had 410 acres of land. Adjoining, or near, she had a farm. She was an aunt of his first wife and had lived all her adult life in the same vicinity; had frequently passed his farm on her way to church of which both were members; had often visited his home on his farm when his first wife, her niece, was alive. After the death of his first wife, he called at the home of plaintiff three times. During the first call he proposed marriage. Later they became engaged. In the situation outlined, they called at Hebron, the county seat, upon J. P. Baldwin, a lawyer in good standing. His testi-

mony and proper inferences therefrom disclose the following facts: They called at Baldwin's home December 24, 1927, when he was ill. Later, the same day, they appeared together in his office, pursuant to arrangement, and asked him to prepare the instrument in controversy, saying neither was to have property of the other, except that plaintiff was to have the Wulf home in Deshler. They talked about the effect of the contract and were told by the attorney for both that "both were waiving a fourth interest in the other's estate when one of them died." They said at the time they knew each other's property. Henry Wulf said in her presence he paid $4,200 for the home she was to get and had built a garage and improved the house. The written instrument was read to both parties. While plaintiff, testifying in her own behalf, contradicted the testimony of her attorney in some respects, the evidence shows her memory was not good. She could not remember details of many important affairs of her life, about which she was interrogated. She admitted she asked Henry Wulf in advance how much he would give her and said he had answered, "everything," but all she claimed he had promised her was the Deshler home and $2,000. The advice of their counsel was available to her. For many years she had opportunity for acquiring knowledge of the extent and value of the property in controversy. After entering into the contract, she had a home with Henry Wulf in Deshler from December 24, 1927, until September 21, 1932. She preserved her own estate for herself and children. She had access to the antenuptial contract; examined it a year and a half after her third marriage; had a disagreement with her third husband over the $2,000 she said he had agreed to give her; called upon her relatives at a family meeting to aid her in obtaining redress; left her Deshler home for a few days; refused temporarily to return without her husband's recognition of her additional claim; did not sue to reform the contract; returned to him at his request with the contract unchanged and lived with him until he died. From proceeds of the sale of her own farm, after her marriage to Henry Wulf, she received over

$2,000 for herself and $1,000 for each of her three children. The value of decedent's farm land, as estimated by witnesses best qualified to testify, did not exceed $45,000. It was not scattered in different states or counties. It was within the range of plaintiff's vision practically all her adult life. Its extent and value could not have been concealed from her. She could have been a competent witness to testify to the value of her own adjoining land. Under the circumstances, Henry Wulf had good reason to assume her knowledge of the extent and value of his 410 acres of land was equal to his own. If she did not know the value of the Deshler home, he told her what he paid for it and mentioned improvements. In the antenuptial contract it was valued at $5,000, a fair estimate. There is nothing in the record to show that the personal property owned by Henry Wulf exceeded his personal obligations to any considerable extent. He performed his written agreement with plaintiff and his marriage contract as long as he lived. After his death the administrator and the children tendered her a deed for the Deshler home. There was no such disproportion in values under the facts of this case as to cast on the children of decedent the burden of proving a more complete disclosure than that made, in view of plaintiff's knowledge. A preponderance of the evidence does not prove fraud or unfairness or violation of duty invalidating the antenuptial contract. The mutual release by each party of all interest in the farm lands of the other was a sufficient consideration as to both parties. *In re Estate of Enyart,* 100 Neb. 337. In law and equity under the facts, plaintiff is bound by her agreement as made and it defeats her claim for one-fourth of the farm lands of which her husband, Henry Wulf, died seised.

For the reasons stated, the judgment of the district court is reversed and the action in partition dismissed.

REVERSED AND DISMISSED.