IN RE ESTATE OF W. R. STRICKLAND, DECEASED.
FLORENCE LAKE STRICKLAND, APPELLANT, V. OMAHA NATIONAL BANK ET AL., APPELLEES.
149 N. W. 2d 344

Filed March 10, 1967. No. 36425.

Harry H. Foulks, for appellant.

Doerr & Doerr, Burbridge & Burbridge, and Rickerson & Homan, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

CARTER, J.

This is an appeal from a judgment of the district court for Douglas County denying the right of a widow by her election to take the share of her husband's estate as provided by law contrary to the provisions of her husband's will.

The plaintiff, Florence Lake Strickland, and Dr. W. R. Strickland, her deceased husband, were married in Omaha, Nebraska, on April 30, 1951. It was a second marriage by both parties. Florence had a daughter by a previous marriage. Dr. Strickland had no children. Each had property of his own at the time of the marriage. Dr. Strickland was 78 years of age and Florence was 61 at the time of the marriage. They lived together until Dr. Strickland's death on October 10, 1962.

On April 27, 1951, 3 days before their marriage, the

parties entered into an antenuptial agreement by which each was to retain his own property free of any rights of the other as if a marriage was not entered into. On August 18, 1958, Dr. Strickland executed a last will and testament which was admitted to probate on November 7, 1962. On March 28, 1963, Florence filed in the county court of Douglas County an election to take under the statute rather than under her deceased husband's will.

It is the contention of the defendants that the antenuptial contract bars her right to elect under the statute. Florence asserts that the antenuptial contract is void in that Dr. Strickland did not, prior to and at the time the contract was signed, apprise her of the extent and value of his property. She also asserts that if the contract was ever binding, it was abrogated by the will of Dr. Strickland executed subsequent to the making of the antenuptial agreement.

The antenuptial agreement may be summarized as follows: Whereas a marriage is intended to be solemnized between the parties and the legal relations as to their respective properties may be different than they desire because of said marriage, and whereas the second party is the mother of a daughter by a previous marriage whom both parties desire should be protected against loss of her anticipated inheritance from her mother that would occur because of the marriage, they entered into the agreement. Thereafter each of the parties listed the properties they owned. The contract then states that the first party, Dr. Strickland, has seen or inspected and is familiar with all the real estate and has his opinion as to its value. It then states that the second party, Florence, has no personal property. The contract then states the intention of the parties to be that each would continue to own separately all property that each now owns, whether owned by either at the commencement of the marriage, or thereafter acquired, or coming to them during the marriage, as if the said proposed marriage had never been celebrated. Each party then agrees

and covenants to and with each other that, upon the death of either, the survivor shall not have and will not assert any claim, interest, estate, or title under the laws of any state, because of such survivorship in or to any property of the other and each waives all rights of dower and distributive interest which either would have in the property of the other and each likewise relinquishes to the heirs, administrators, executors, and assigns of the deceased any and all of his or her claims, distributive share, interest, estate, or title that he or she would otherwise be entitled to as the surviving husband or wife. The last paragraph of the contract provided: "To the full and proper performance of all of the foregoing agreements, covenants, and stipulations, the parties hereto respectively bind themselves, their heirs, executors, administrators, and assigns."

It is the contention of Florence that the antenuptial contract is void for the reason that Dr. Strickland failed to apprise her of the value of his property before the contract was entered into and that such failure, in effect, amounted to a fraud upon her sufficient to invalidate the contract. On the trial Florence attempted to testify that she had not seen or inspected Dr. Strickland's property before signing the antenuptial contract as stated in the antenuptial agreement. She offered, also, to testify that she did not know the amounts of money on deposit in building and loan associations in the city of Omaha, mentioned in the agreement, or how many building and loan associations were involved. She likewise offered to testify that the contract was prepared by Dr. Strickland's attorney, that she had not seen a copy of the contract prior to its signing, and that it was not read to her at the time of signing on April 27, 1951. She likewise offered to testify that she did not know that Dr. Strickland owned the property listed in the contract as belonging to him, and that she was advised by no one as to its value. Objections were made to this evidence by all defendants on the ground that the evidence was in

violation of the parol evidence rule and incompetent under the dead man's statute, section 25-1202, R. R. S. 1943. The objections were sustained by the court and offers of proof were made and overruled. These rulings are asserted as error in this appeal.

Section 25-1202, R. R. S. 1943, which we shall hereafter refer to as the dead man's statute, provides in part: "No person having a direct legal interest in the result of any civil action or proceeding, when the adverse party is the representative of a deceased person, shall be permitted to testify to any transaction or conversation had between the deceased person and the witness, * * *."

The general purpose of the statute is primarily to protect the estates of decedents from fraudulent and fictitious claims, and the strict construction of the statute adoped by our court does not encompass any situation where the witness has no direct legal interest in the result of the action. It does not contemplate a proceeding against an executor or administrator, the result of which can neither increase nor diminish the assets of the estate, but concerns only the manner in which the assets will be distributed. In such a proceeding an executor or administrator is not concerned with the merits of the claims of rival claimants in the sense that he should prefer one over the other, but is concerned only with seeing that the assets are properly distributed, either according to the testator's will or the statute, whichever may be held to be the proper criterion. Under the situation we have here, the executor is not an adverse party. In re Estate of Craig, 101 Neb. 439, 163 N. W. 765; In re Estate of Vetter, 139 Neb. 307, 297 N. W. 554; In re Estate of Vetter, 142 Neb. 167, 5 N. W. 2d 215.

But in the instant case, the beneficiaries of the will of the deceased were also parties defendant and each of them object to the evidence of the widow as being incompetent under the dead man's statute. This is, in fact, a contest between the widow claiming under the will on the one hand and the legatees, devisees, and

beneficiaries claiming against it on the other. Each is a person having a direct legal interest in the result of the action. The issue involves the validity of an antenuptial contract which the widow admits was signed by herself and her husband. This she is competent to do irrespective of the dead man's statute. In re Estate of House, 145 Neb. 866, 18 N. W. 2d 500, 159 A. L. R. 401. But we point out that the widow is incompetent as a witness to testify against any person having an interest in the result of the litigation because of her own direct legal interest therein which is adverse to the legal interests of the legatees, devisees, and beneficiaries. While this precise point does not appear to have been decided by this court, no reference having been cited to us and since we have found none, we determine that it falls squarely within the principle announced in analogous cases and that the widow is an incompetent witness. Thompson v. DeVoe, 180 Neb. 654, 144 N. W. 2d 188; Fischer v. Wilhelm, 140 Neb. 448, 300 N. W. 350; Johnson v. Omaha Loan & Bldg. Assn., 128 Neb. 37, 257 N. W. 370.

Objections were also made that the evidence of the widow was objectionable as contravening the parol evidence rule. A written contract expressed in unambiguous terms is not subject to interpretation or construction and the intention of the parties to such a contract must be determined from its contents. The parol evidence rule is not merely one of evidence, but is a rule of substantive law which declares that certain kinds of facts are legally ineffective and forbids them to be proved. Gerdes v. Omaha Home for Boys, 166 Neb. 574, 89 N. W. 2d 849. Recitals as a general rule are not strictly any part of a contract although they may be looked to in determining the proper construction of the contract or the intention of the parties. Consequently mere recitals of fact in a written contract, as distinguished from contractual provisions, may be varied without violating the parol evidence rule. 17A C. J. S., Contracts, § 314, p. 177; Schommer v. Bergfield, 178 Neb.

140, 132 N. W. 2d 345. A recital in an antenuptial contract may be varied or explained to be something other than stated, but not so as to vary or defeat the instrument for the purpose for which it was given. As to such latter purpose and that only, in the absence of efficient fraud, the person executing the contract is estopped from contradicting the recital. Bibelhausen v. Bibelhausen, 159 Wis. 365, 150 N. W. 516. The following language of the antenuptial contract: "Whereas, second party has seen or inspected and is familiar with all of said real estate and has her opinion of its value," is usually considered a mere recital not within the parol evidence rule. Warner's Estate, 207 Pa. 580, 57 A. 35, 99 Am. St. Rep. 804; Baker v. Baker, 24 Tenn. App. 220, 142 S. W. 2d 737. We think, therefore, that a wife who has entered into an antenuptial agreement may show by competent evidence that the extent of her deceased husband's estate was concealed from her at and prior to the signing of the agreement notwithstanding she acknowledged therein that she had been informed of the extent of his estate.

This brings us to the question of whether or not, with or without the excluded evidence of the wife, the trial court erred in withdrawing from the jury the issue involved in attempting to set aside the antenuptial contract. The plaintiff's case in this respect proceeds wholly upon the theory that upon their engagement to marry, a confidential relation between them arose which placed upon the defendants the burden of showing, in subsequently entering into the contract, that the deceased acted in good faith with the plaintiff by making a full disclosure with respect to his financial circumstances at the time. There is no evidence in this record, admitted or offered, of any active fraud or misrepresentation as to the deceased's property or financial circumstances at the time the antenuptial contract was made.

The parties were married on April 30, 1951. The husband was 78 years of age and the wife 61 at that time.

The husband died on October 10, 1962, more than 11 years later. They lived together during the period of the marriage in a home in Omaha owned by the wife. The husband had been married many years previously. His first wife died 3 months after the marriage and he never remarried until his marriage here involved. He had no children, and at the time of his death he had neither parents, brothers or sisters, nor children. He had practiced as a physician for many years and had been long acquainted with Florence and her former husband, Dr. Lake, who was also a practitioner in the medical profession. He had accumulated property over the years, the value of which is not shown as of the date of the contract.

The wife had been previously married to Dr. Lake who died in 1944. She is the mother of a daughter, now married. At the time of the execution of the antenuptial contract, she was the owner of property that came to her from her former husband, the value of which is not shown by the record.

On April 27, 1951, 3 days before the marriage, the parties entered into the antenuptial contract here in question. The evidence shows that the husband employed the attorney who drafted the contract. The attorney testified that he was employed by and advised with Dr. Strickland, after which he prepared the agreement. On the day of the signing, the parties came to his office together and, after signing the instrument, they left together. No one else was present at the time of signing. The attorney was interrogated as to whether or not anything was said by either party as to the value of the other's property. Objections were sustained to these questions, after which plaintiff offered to prove that nothing was said. The attorney was asked if he knew as a fact that the statement in the contract was true, when he placed it there, which recited: "Whereas, second party has seen or inspected and is familiar with all of said real estate and has her opinion of its value."

Objections were sustained and plaintiff offered to prove by the witness that he knew it was not true. We think the questions as to whether or not anything was said by the parties prior to the execution of the contract as to the value of the property of either was competent and we shall consider the case as if the question had been answered in the negative. As to the question regarding the quotation from the contract, we think it was properly sustained as a privileged communication between attorney and client. The plaintiff will not be permitted to reap any benefit accruing to her in showing that the husband employed and paid the attorney to draft the contract and then avoid the privilege that attaches to such relationship.

Antenuptial contracts are valid in this state if made in accordance with section 30-106, R. R. S. 1943. An antenuptial contract is valid if fair and fairly made by persons legally qualified to contract. Rieger v. Schaible, 81 Neb. 33, 115 N. W. 560; In re Estate of Maag, 119 Neb. 237, 228 N. W. 537. Antenuptial contracts are not against public policy, but on the contrary, if freely and intelligently made, they are regarded as generally conducive to marital tranquillity and the avoidance of disputes concerning property. In re Estate of Enyart, 100 Neb. 337, 160 N. W. 120. The burden is upon the husband, or his representatives, to show that an antenuptial contract apparently unjust to the wife was fairly procured. In re Estate of Maag, *supra;* In re Estate of Enyart, *supra.* A court of equity, when called upon to consider an antenuptial contract, should examine and construe the instrument in the light of the circumstances surrounding that particular case, and enforce or annul the agreement according to the facts disclosed in the case before it. No arbitrary rule can be laid down which would apply to all antenuptial arrangements. Rieger v. Schaible, *supra;* Wulf v. Wulf, 129 Neb. 158, 261 N. W. 159.

A confidential relationship usually exists between

prospective spouses. Ordinarily the burden of proof as to the invalidity of an antenuptial contract is on the party alleging it; but if the contract is unjust and unreasonable to the prospective wife on its face, a presumption of fraud arises, the burden shifts, and it is incumbent on the husband to prove the validity of the contract. Baker v. Baker, *supra;* Christians v. Christians, 241 Iowa 1017, 44 N. W. 2d 431; Del Vecchio v. Del Vecchio (Fla.), 143 So. 2d 17. Although there is nothing inherently suspicious about antenuptial agreements, the courts scrutinize them with care because the relationship of the parties is one of mutual trust and confidence at the time it is entered into. In re Estate of Enyart, *supra.* The burden is not on the woman to inquire but on the man to inform. In re Estate of Maag, *supra.* While a disclosure by the prospective husband should be full, fair, and open, a failure to divulge does not necessarily mean that the agreement will be condemned. The test of adequacy may still remain, and if it is met by a showing that it is fairly and honestly made under all the circumstances, the agreement may be enforced. The basic issue is fraud or overreaching, not the absence of disclosure. In re Estate of Cantrell, 154 Kan. 546, 119 P. 2d 483; McClellan Estate, 365 Pa. 401, 75 A. 2d 595.

In one sense of the term, every antenuptial contract is unfair, at least by legislative standards indicated in the statute of descent and distribution. The very purpose of the contract is to be unfair by those standards. We can hardly say, under such a contract, that an apparently unreasonable provision for the wife or a disproportion between what she is to receive and the value of his property *of itself* affords a basis for voiding such a contract. Unless there be fraud or overreaching, the contract is valid. This is the effect of our holding in Kingsley v. Noble, 129 Neb. 808, 263 N. W. 222, wherein we overruled the fifth point of the syllabus in In re Estate of Enyart, *supra.*

The antenuptial contract shows that each of the parties was possessed of considerable property at the time the contract was signed and the marriage celebrated. The contract sets out the property belonging to the husband as three residences and a life estate in a fourth, all in Omaha; a lot and quarter section of land in Powers County, Colorado; and an unimproved quarter section of land in Rock County, Nebraska, the values of which are not shown. The contract shows the property of the wife as three lots in Omaha occupied by a store building and a residence, and two farms of 640 acres each in Cass County, Nebraska, the values of which are not shown. The contract provides, after reciting the purpose of the agreement, that the plaintiff is the mother of a daughter of a previous marriage and that both parties desire that their marriage shall not interfere with the disposition of plaintiff's property to her daughter. The husband had no children, parents, or brothers and sisters. It is plain from the contract itself that the motivating factor in the making of the contract was to protect the plaintiff's property for the benefit of her daughter as against any legal interest of the prospective husband. This inference is further borne out by the statement by the husband that he has seen or inspected and is familiar with all said real estate and has his opinion of its value, a provision usually made applicable only to the prospective wife.

The evidence shows that the wife had a social standing practically the same as the husband and that she was an intelligent woman who had owned and looked after her property interests since the death of her first husband in 1944. The contract did not provide for the transfer of any property to her, a fact she must have known. She was not in need of support, presently or prospectively. She now asserts that she was not informed of the value of the husband's property and was therefore defrauded, when she well knew at the time she was getting no property at all. If she knew that

she was to get nothing, as she did, a failure to disclose the value of the husband's property appears to have been of little consequence to her at the time. That the wife had knowledge of the purpose and substance of the contract is not denied by the evidence or offer of proof, but it does indicate that she was completely indifferent as to the pecuniary phase of the case incident to the proposed marriage and was intent only upon the other advantages of the agreement. She had a right to assume that her husband, who was 17 years her senior, would die before her. For 11 years she lived with her husband, knowing of the existence of the contract and, so far as this record shows, made no effort to nullify or change its effect. Only after his death, when her purpose of protecting her property from the legal entanglements resulting from the proposed marriage for the daughter had been fully and finally accomplished, did she ever claim fraud in order to share in his property by disavowing the agreement. Her offer to prove that she signed the agreement without having it read to her can avail her nothing in the absence of proof that any artifice was used to prevent her from knowing its contents. Baker v. Baker, *supra.*

There is not a word of evidence in this case showing fraud, misrepresentation, or overreaching on the part of Dr. Strickland. The only question for consideration is whether or not the agreement was so unfair, unreasonable, and unconscionable as to require this court to set it aside. It is plain that the contract was more beneficial to her purposes than those of Dr. Strickland. We fail to see how the contract is unfair, unreasonable, or unconscionable. After succeeding in protecting her property for her daughter during the existence of the marriage and knowing for 11 years of the existence of the contract, with a complete absence of fraud or overreaching, it is with poor grace and a complete want of equity that she now asserts its invalidity.

In the absence of fraud or overreaching, or of unfair-

ness or unreasonableness of such a degree as to void the contract, a man and woman, anticipating marriage, are as free to enter into an antenuptial contract as any other agreement. There is not the slightest inference that Dr. Strickland did not deal honestly, sincerely, and in good faith in all matters bearing on the proposed agreement. Under all the circumstances of the case, which we are required to scrutinize with care, we think the plaintiff acted understandingly when she made the agreement in question. She accomplished her primary objective in protecting her property for the benefit of her daughter. Her interest in the property of Dr. Strickland was one of indifference as the contract indicates. She appears to be an intelligent woman with some business experience. She knew what she was doing when she signed the contract. It was not until she could feel secure in the protection of her own property for the benefit of her daughter that she was willing to question the validity of the contract. Valid reasons existed for making the contract she did. She had adequate property of her own for her own support. She was not in need, then or prospectively. Having received the benefit of the contract, and her husband's lips having been sealed by death, she will not now, after a lapse of 11 years, be permitted to avoid her contract, no fraud or unreasonableness being shown, and recover that which she gave up as a consideration for the contract in the first place. Bibelhausen v. Bibelhausen, *supra*; Baker v. Baker, *supra;* Wulf v. Wulf, *supra*.

Since it is the very purpose of an antenuptial contract to exclude the operation of statutory law with respect to the property rights of the parties, such an agreement usually contains a release by one or both of the parties of the rights that would otherwise attach. This contract is no exception. But it is here contended by the wife that the deceased, by making a bequest to her in his will, invalidated the antenuptial agreement. This is not the law. She is entitled to take the bequest, but

she may not reject it and claim under the statute instead, for there is no merit in the contention that the husband by making the bequest waived the antenuptial agreement. Will of Paulson, 254 Wis. 258, 36 N. W. 2d 95; Bartle v. Bartle, 121 Colo. 388, 216 P. 2d 649.

No fraud, deceit, or concealment can be found in this case. Plaintiff was not overreached or mislead, and she was fully aware of the effect of the contract upon her rights. Her primary concern was the protection of her own property for the benefit of her daughter by a previous marriage and she appeared wholly indifferent to the matter of financial return from her future husband's property when she signed the contract. The waiver of all property rights by each in the property of the other was not unconscionable under all the evidence and circumstances shown. She is bound by the contract she understandingly made.

AFFIRMED.