IN RE ESTATE OF KATHERINE KENT GRASSMAN, DECEASED. WADE W. GRASSMAN, APPELLEE, V. CAROL JENSEN, EXECUTRIX OF THE ESTATE OF KATHERINE KENT GRASSMAN, DECEASED, APPELLANT.

158 N. W. 2d 673

Filed May 3, 1968. No. 36757.

Joseph L. Krause, for appellant.

Warren S. Zweiback, Dana C. Bradford III, and Monsky, Grodinsky, Good & Cohen, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SMITH, J.

The county court adjudged that an antenuptial promise of Wade W. Grassman, surviving husband of Katherine Kent Grassman, was not binding. The court also granted Wade's application for statutory allowances. On appeal the district court rendered a judgment identical with that of the county court, and the executrix has appealed. The issues are related to the antenuptial promise; allowances in lieu of homestead and for maintenance; and the award of wearing apparel, ornaments, and household furniture of the deceased.

Wade and Katherine, acquaintances since childhood, began keeping company in 1948 at Alliance, Nebraska, where they had grown up. Each one had children of a former marriage. At age 47 he was senior to her by 5 years. The association continued to 1956 when Wade removed to Omaha, Nebraska. From then up to August 1960, they were together once a month.

The marriage ceremony was set for August 17, 1960, at 10 a.m. Although Wade arrived at the Alliance depot at 7:30 a.m. that day, according to his testimony, an accident delayed the ceremony several hours. A test

tube containing a specimen of Wade's blood had been broken in shipment, and another premarital examination was necessary. For that purpose Wade proceeded to Scottsbluff, Nebraska, in company with Richard Frech, Katherine's son-in-law.

While Wade was returning from Scottsbluff, he first learned that he must stop at the office of William Hein, an Alliance lawyer. Wade was to sign some papers, Richard said, "to protect the girls." The men arrived at the office at 11:40 a.m., 10 minutes after the conversation. There Wade hurriedly read, signed, and acknowledged a document handed him by Hein. The only other signature on the document is that of Hein as the notary public who took Wade's acknowledgment. The document reads: "The undersigned, Wade W. Grassman, who is contemplating marriage to Katherine Kent, of Alliance, Nebraska, hereby agrees and contracts that he shall receive no part of the estate of said Katherine Kent should he survive her. He hereby completely and without any reservation renounces and surrenders any and all rights he might acquire in her property by reason of being her husband should she precede him in death.

"He hereby acknowledges that he has been informed of the nature, value and extent of the property of said Katherine Kent."

The transaction in Hein's office lasted 3 minutes. No description or valuation of Katherine's property was given to Wade, and no material fact except home ownership, according to his testimony, was then known to him. Katherine's property was worth $83,000 which included $13,000 for the home and $38,000 for the inheritance from her father, F. W. Harris, who had died in June 1960. Her debts were trifling. Wade, a high school graduate working as a railroad clerk, was generally inexperienced in business and legal affairs.

Antenuptial conversations about Katherine's property are described in testimony of Katherine's daughter, Kath-

erine Sue Frech. A resident of Wyoming, she visited her mother at Alliance for 2 weeks immediately prior to August 17, 1960. On two days between August 3 and 10, the value of the Harris estate and Katherine's one-third share of it were topics of seven conversations in Wade's presence. During the evening of August 16, Wade again visited at Alliance. He, Katherine, and the Frechs talked about the antenuptial agreement as follows:

"A. Dick had suggested an agreement would be a good idea, an agreement in regard to Mother's wish that my sister and me receive her holdings, and Wade thought this was a good idea too. Q. Is that what he said? A. Yes, he said he was interested in my Mother for herself alone. Q. How long did this conversation last? A. I'd say about half an hour. Q. And what did your Mother say? A. That this was her wish too; she wanted her two daughters to be taken care of. Q. Did Mr. Grassman say anything else * * *? A. That he, in loving Mother, wished this too. * * * Q. * * * what do you mean? A. That my sister and me be taken care of and that whatever holdings Mother might have would go to Carol and me."

In August 1960, Wade lived in Omaha where he worked for the Chicago, Burlington & Quincy Railroad Company. Burlington records in evidence were kept in the regular course of business. Reports dated and handwritten by Wade reveal that he worked in Omaha every day from August 2 through August 16. During that period one railroad pass was issued to him. He departed from Omaha on train No. 19 at 9:45 p.m., August 16, and the train arrived at Alliance the next day at 7:30 a.m. The conclusion is inescapable. Whether or not Katherine Sue was overcome with greed, her testimony is incredible.

Wade retired in December 1963, on account of disability. On February 11, 1966, the day of Katherine's death, his monthly railroad benefits amounted to $320.

During that period Katherine had contributed $100 per month for his maintenance because of his circumstances.

Katherine died owing no one. Her property comprised wearing apparel, ornaments, household furniture, and intangibles. Intangible property in her name alone was valued at $56,115.17. Intangible property owned in joint tenancy with Wade was valued at $27,606.30.

Katherine died without issue of the second marriage. The will admitted to probate had been executed on August 16, 1960, the day before the marriage of Wade and Katherine. She bequeathed all her property in equal shares to her two daughters, naming them as executrices.

Fraud in the inducement of an antenuptial agreement between prospective spouses is sufficient ground for avoidance of the agreement in the absence of contravening equitable considerations. The decisive test is factual. In re Estate of Maag, 119 Neb. 237, 228 N. W. 537; In re Estate of Enyart, 100 Neb. 337, 160 N. W. 120. The question whether an antenuptial agreement may be avoided by a surviving husband is open in Nebraska. It has been said that a widow's claim is usually stronger than a widower's claim because of sympathy for the widow. 2 Lindey, Separation Agreements and Ante-Nuptial Contracts (1967 Supp.), § 90, p. 133. In recent decisions we did not assume that the intended wife usually bargained from a position of weakness. See, Strickland v. Omaha Nat. Bank, 181 Neb. 478, 149 N. W. 2d 344; Caprette v. Spieth, 181 Neb. 11, 146 N. W. 2d 746. The sex of the surviving spouse is one of many elements to be considered. Some of the other facts that may be significant are age, prior marriage, amount of business experience, strength of the confidential relation, knowledge of the nature and extent of the property, adequacy of consideration, and opportunity for investigation and deliberation. We conclude that Wade's promise is not binding. It is therefore unnecessary for us to consider section 30-106, R. R. S. 1943.

The argument against the allowance in lieu of homestead is that Katherine was not the head of the family. The exemption statute, section 25-1552, R. R. S. 1943, contains no definition of the phrase "heads of families." A similar phrase is defined in the homestead law, but the definition is restricted to sections 40-101 to 40-117, R. R. S. 1943. The exemption statute should receive a liberal construction consistent with its purpose to benefit the family of the debtor. Frazier v. Syas, 10 Neb. 115, 4 N. W. 934. See, also, Thomas v. Sternhagen, 178 Neb. 578, 134 N. W. 2d 237. A wife contributing to the support of her dependent husband ordinarily qualifies as the head of the family within the meaning of the exemption. See, State ex rel. Lucas v. Houck, 32 Neb. 525, 49 N. W. 462; Roberts v. Moudy, 30 Neb. 683, 46 N. W. 1013; Schaller v. Kurtz, 25 Neb. 655, 41 N. W. 642. Allowance of this item to Wade was correct.

The executrix complains that the period of the maintenance allowance includes an interval prior to Wade's filing his application on November 10, 1966. On December 21 the county court ordered the allowance, $100 a month, to commence April 8, 1966, when the court had granted administration of the estate. The statute provides for "such reasonable allowance * * * as the county court shall judge necessary for * * * maintenance during the progress of the settlement of the estate * * *, which shall not be longer than one year after granting administration, nor for any time after the personal estate shall be assigned to the surviving husband or wife * * *." § 30-103 (2), R. R. S. 1943.

The executrix relies upon Smith v. Estate of Bayer, 95 Neb. 532, 145 N. W. 1029. In that proceeding the county court denied the application filed by the widow nearly a year after her husband's death. She subsequently died, having taken no steps to appeal. The administrator of her estate prosecuted an appeal to the district court which dismissed the action on demurrer. This court affirmed the judgment, saying: "* * * she

waived her right to the year's support, and the administrator of her estate succeeded to no right which could be enforced by him against the estate of her deceased husband."

The practice followed by both courts in the allowance to Wade is common. It is within the language and the spirit of the statute. To remove doubt, we disapprove the contrary implication of the Smith case. The interval of time between grant of administration and timely application by a surviving spouse for a maintenance allowance may be included in the period of allowance.

The judgment requires the executrix to deliver deceased's wearing apparel, ornaments, and houshold furniture to Wade. A few hours after Katherine died, Carol received deceased's diamond ring, earrings, watch, and rocking chair from Wade. He also delivered deceased's fur coat to Katherine Sue the next day and other clothing to Carol on April 8.

On April 9, 1966, Wade wrote Katherine's sisters a letter that read in part: "Yesterday * * * They (Carol and Katherine Sue) took the rest of their mother's clothes but I gave them all information that nothing else would leave without you * * * having a voice on many things—unless court forces me to give everything up—Such as gold rim plates, amber plates, goblets, sterling silver with (H) and pearl handle knives & forks." In July 1966, Wade delivered the silverware and china to Carol.

Wade testified that he had voluntarily delivered the items to Carol as executrix, but he admitted that he had never mentioned her official capacity. Other testimony discloses that Wade in delivering the property made gifts. The transactions were open and fair. Carol should not be charged with the gifts.

We modify the judgment by excluding the above gifts from the property that the executrix is to deliver to

Wade. The judgment is affirmed as modified.

AFFIRMED AS MODIFIED.

CARTER and SPENCER, JJ., concurring in the result in part, and dissenting in part.

We concur in the result of that part of the opinion holding the purported antenuptial agreement unenforcible on the ground of fraud. It would have been better, in our opinion, to have voided the purported antenuptial agreement for failure to comply with section 30-106, R. R. S. 1943, for the reason that it was not signed by both of the parties to the proposed marriage and acknowledged in the manner required by law for the conveyance of real estate. Such is the clear holding of this court in Dorshorst v. Dorshorst, 174 Neb. 886, 120 N. W. 2d 32. By so holding, the inference that the purported antenuptial contract is valid except for the fraud would be avoided.

We dissent from that part of the opinion holding that the wife, under the facts as recited in the opinion, is the head of the family within the meaning of the exemption provided for in section 25-1552, R. R. S. 1943. There is but one head of a family and but one exemption allowable. The holding that the wife is the head of the family and entitled to the exemption in lieu of homestead under the facts shown is contrary to the previous holdings of this court. The mere fact that a wife makes some contribution to the family living costs, or to the husband's personal living expenses, does not, ipso facto, make her the head of the family and entitled to the statutory exemption in lieu of homestead. In this day of working wives, whatever her contributions to family maintenance may be, a wife may, under the holding of this opinion, claim to be the head of the family or not, depending on where the interests of the parties lie. This is not the intent of the statute providing for the exemption in lieu of homestead.

WHITE, C. J., concurring with Carter and Spencer, JJ.

I concur in what Carter, J., says. I would add further

what seems to me to be plainly apparent. The statute is in derogation of the common law, must be strictly construed, and creates a new right to antenuptially contract which was nonexistent before. By its terms it is limited to real property. We have no right to inquire into the policy or wisdom of this legislative declaration. And, even if we did, the statute is designed, in the premarital context, to free the fixed, separately inalienable inchoate interest of the spouse in real estate from testamentary restriction. A spouse's unfettered power to dispose of his or her personal property, inter vivos, contrasts sharply. A premarital contract, with a disclosure required (as it is), and only partially freeing personal property from the descent statute, could lead to problems invading the transcendent considerations present in preserving the freedom of alienation of personal property inter vivos.