418 So.2d 275 (1982)
FLAGSHIP NATIONAL BANK OF MIAMI and Charles Curtis King, Jr., As Personal Representatives of the Estate of Charles Curtis King, Deceased, Appellants,
v.
Susan Fitzgerald King, Appellee.
No. 81-2206.
District Court of Appeal of Florida, Third District.
June 29, 1982.
Rehearing Denied September 8, 1982.
*276 Therrel, Baisden, Stanton, Wood & Setlin and Howard Setlin, Miami Beach, for appellants.
John F. Muckerman, Miami Beach, for appellee.
Before SCHWARTZ, NESBITT and JORGENSON, JJ.
SCHWARTZ, Judge.
Prior to their marriage, Mr. and Mrs. King made an oral agreement that neither would have a claim upon the other's separate property when he or she died. Afterwards, they memorialized this understanding in writing. The trial judge held that the provisions of Section 732.702(2), Fla. Stat. (1979), which require a "fair disclosure" of a spouse's assets to validate such a waiver by the other after marriage, controlled these facts and, in the absence of a showing that such a disclosure had been made, therefore struck the objections of Mr. King's personal representatives to any claim by the widow to a family allowance and her elective share of his estate. We hold to the contrary that the prenuptial date when the original agreement was entered is determinative. Since no disclosure is required under the statute to sustain a waiver agreed to at that time, we reverse the judgment under review.
When the Kings met in 1959, he was seventy-one and she fifty-two years of age. Each had been married twice before and each had grown children. Each had two other important things in common. They were both obviously persons of substantial independent means;[1] and both wished to preserve their respective individual resources for the benefit of their own families. Accordingly, before their marriage, which took place on January 21, 1960, they specifically agreed that, when they died, neither would take any part of his or her spouse's estate. Although this prenuptial agreement was not in writing, its existence was indisputably established by repeated post-marriage statements which were. The first of these was embodied in a will executed by Mr. King on June 5, 1964, the first paragraph of which stated clearly:
[T]he name of my present wife is SUSAN FITZGERALD KING, more commonly known as SUE KING, whom I married on January 21, 1960; that prior to our marriage, we orally agreed that each of us should have, keep, and retain full ownership, control and enjoyment of all property owned by us respectively; that each of us should have the sole, exclusive and absolute right to dispose by Will or otherwise of any and all property, real, personal, or mixed, owned by either of us at the time of marriage; in like manner as if our marriage had not taken place and each of us had remained unmarried; and we further agreed that all of the income, rents, issues, profits, dividends and interest arising or emanating from our respective property holdings should be and belong exclusively to the owner thereof. This declaration shall constitute a written memorial of our said oral agreement.
At the foot of her husband's will, Mrs. King made the following duly witnessed "declaration by wife":
I, SUSAN FITZGERALD KING, wife of Charles Curtis King, hereby certify (1) that I have read the foregoing Will of my husband, Charles Curtis King; (2) that the declarations contained therein with respect to our oral agreement are true and correct; and (3) that I hereby ratify and confirm our oral agreement with respect to the disposition of our respective property and the income, rents, issues, *277 profits, and dividends and interest thereof.
DATED at Miami Beach, Dade County, Florida, this 5th day of June, 1964.
/s/ Susan Fitzgerald King
On April 18, 1966, in turn, Mrs. King made a will and the husband made an appended declaration which respectively tracked these provisions of Mr. King's 1964 will. Moreover, Mrs. King included a further statement that
I expressly make no provision for my beloved husband, CHARLES CURTIS KING, not because of any lack of love or affection for him, but solely because (1) he has adequate independent means of his own; and (2) he has expressly requested to be omitted herefrom; and (3) our mutual desire to provide for our respective children of prior marriages.
Clauses almost identical to these were included both in Mrs. King's later will of 1973 and Mr. King's, executed in 1978.
The Kings' marriage lasted for almost twenty years. During that time, they conducted their financial affairs in a manner thoroughly consistent with these expressed intentions. Soon after the marriage, for example, they bought a home on La Gorce Island in Miami Beach by the entireties, with each paying 50% of the purchase price from individual resources. Mrs. King paid for her own expenses from her own funds, and even bought a home in Highlands, North Carolina which was placed in her name alone. Similarly, each spouse filed individual income and intangible tax returns throughout the marriage.
On January 2, 1980, Mr. King died, leaving a probatable estate of about $800,000[2] almost entirely to his son, Charles King, Jr., who is one of the present appellants. In accordance with their agreement, he bequeathed nothing to his widow. Notwithstanding their mutual understanding and the fact that she was revealed to have separate assets of substantially greater value than Mr. King's, at least $1,500,000, Mrs. King claimed the right to a family allowance, Sec. 732.403, Fla. Stat. (1979), and an elective share of her husband's estate, Sec. 732.201, Fla. Stat. (1979). After a trial at which Mr. King's representatives could not demonstrate that he had made any particular revelation of his assets to Mrs. King either before or after the marriage,[3] the lower court concluded (a) that, although the parties had indeed agreed to waive their respective rights before the marriage, the agreement was invalid because it was not then in writing, and (b) that the postnuptial written memoranda of that agreement were ineffective because they were not preceded by a "fair disclosure" of Mr. King's estate. Hence, the representatives' petition to disallow Mrs. King's claims was denied.
Our disagreement with this position is necessarily based on our interpretation of Sec. 732.702, Fla. Stat. (1979) which, as all agree, is controlling because Mr. King died after its effective date. Topper v. Stewart, 388 So.2d 1270 (Fla. 3d DCA 1980), review denied, 397 So.2d 779 (Fla. 1981). Briefly summarized, the statute[4] validates agreements *278 to waive the rights of a surviving spouse in probate so long as the agreement is in writing, and, in the case of a waiver after, but not before the marriage, is accompanied by a "fair disclosure" of the assets of the other spouse. See generally, Weintraub v. Weintraub, 417 So.2d 629 (Fla. 1982). The obvious reasons for the statute's elimination of the disclosure requirement in the antenuptial situation only are simultaneously to encourage marriage and to recognize that the respective financial duties and responsibilities which marriage itself entails are sufficient bulwarks against the possibility of a spouse's being disadvantaged by an agreement which is not based upon a reasonable understanding of the extent of the other's resources.[5] On the other hand, when the marriage has already taken place, the need to foster it no longer applies; at the same time, the confidential relationship which has arisen between the parties requires that, at the least, fair disclosure form the basis of any such undertaking. The other requirement of Sec. 732.702 that the contract be in writing, which applies in all instances, is, like every such Statute of Frauds provision, simply based upon the prevention of fraudulent claims, 73 Am.Jur.2d Statute of Frauds §§ 510, 562 (1974)  a requirement which has special force in a situation in which one of the parties to the asserted agreement is necessarily dead. Putting the two aspects of the statutory reasoning together, it is apparent that they are both satisfied whenever, as in this case, an agreement is actually reached  without disclosure  before the parties marry if it is reduced to writing at any stage, either before or after the marriage takes place. Of course, our primary, indeed exclusive concern in the realm of statutory interpretation is to vindicate the legislative intent, 30 Fla.Jur. Statutes § 77 (1974), considered in terms of the evident policy and purposes which underlie the provision in question, 30 Fla.Jur. Statutes §§ 104-107 (1974). We therefore adopt that construction here.[6]
Since the object of judicial decisionmaking in general is likewise to reach results which conform to the requirements of common sense and reasonableness, it is neither surprising nor coincidental that the same conclusion follows from a more traditional, legally antiseptic analysis of the issue before us. It is well established that under Statutes of Frauds like Florida's in general and this one in particular[7] which do not render oral contracts "void," see 73 Am.Jur.2d Statutes of Frauds § 513 (1974), such an unwritten agreement is merely unenforceable. Accordingly, it may thereafter be rendered completely enforceable by the execution of a sufficient subsequent memorandum of the original oral undertaking. Rank v. Sullivan, 132 So.2d 32, 36 (Fla. 2d DCA 1961). Specifically, a memorandum may include one contained, as in Mrs. King's case, in a will. Rank v. Sullivan, *279 supra. When that occurs, it is the oral contract  and not the subsequent memorandum which merely evidences its existence  which is given effect. As was said in Simpson v. Green, 231 S.W. 375 (Tex.Comm. App. 1921):
When a sufficient memorandum of a prior oral contract has been made and signed and suit for enforcement is brought, it is the oral contract that is enforced, and not the memorandum by which such contract is proved.
231 S.W. at 378. Applying this doctrine to an antenuptial agreement, the court said in McMinimee v. McMinimee, 238 Iowa 1286, 30 N.W.2d 106, 109 (1947):
Plaintiff [wife] can avail herself of the written instrument (executed after marriage) only to prove the oral antenuptial contract.
Accord, Jones, Statute of Frauds  Oral Antenuptial Agreement in Consideration of Marriage, 5 Wis.L.Rev. 372, 373 (1929) ("... a subsequent compliance with the statute [of frauds] merely supplies the kind of evidence necessary to establish and make enforceable the already existing [oral] contract."), and cases cited.
Under these principles, it is apparent that the determining substantive law is that which controls the validity of the oral agreement itself, as opposed, as in the present instance, to the rule applicable if the contract were deemed effective when the written memorandum is signed. Thus, in Weber v. Weber, 170 Ohio St. 567, 167 N.E.2d 98 (1960), which is directly on point, the court held that an oral antenuptial agreement was rendered enforceable as such by a post-marriage memorandum, and that the writing did not constitute a new agreement which was itself invalid under the law forbidding interspousal contracts. At 167 N.E.2d 102-103, the court held:
It would appear ... that the basis upon which such contracts have been upheld is that the reduction to writing after marriage of the oral contract made prior to marriage constitutes a sufficient written memorandum of the premarital agreement to take it out of the statute of frauds and does not constitute a new contract subject to statutes ... prohibiting contracts between husband and wife... . [e.s.]
For these reasons,[8] the order under review is reversed and the cause remanded with directions to disallow any claims of the appellee to a family allowance or an elective share of Mr. King's estate.
Reversed.
NOTES
[1] Although it is not clear that the precise extent of their respective resources was then known to the other.
[2] His interest in the Miami Beach home held by the entireties of course went directly to Mrs. King.
[3] Mrs. King did say that her husband had not misled her on any subject, except his age.
[4] In full, it provides as follows:

(1) The right of election of a surviving spouse, the rights of the surviving spouse as intestate successor or as a pretermitted spouse, and the rights of the surviving spouse to homestead, exempt property, and family allowance, or any of them, may be waived, wholly or partly, before or after marriage, by a written contract, agreement, or waiver, signed by the waiving party. Unless it provides to the contrary, a waiver of `all rights,' or equivalent language, in the property or estate of a present or prospective spouse, or a complete property settlement entered into after, or in anticipation of, separation, dissolution of marriage, or divorce, is a waiver of all rights to elective share, intestate share, pretermitted share, homestead property, exempt property, and family allowance by each spouse in the property of the other and a renunciation by each of all benefits that would otherwise pass to either from the other by intestate succession or by the provisions of any will executed before the waiver or property settlement.
(2) Each spouse shall make a fair disclosure to the other of his or her estate if the agreement, contract, or waiver is executed after marriage. No disclosure shall be required for an agreement, contract or waiver executed before marriage.
(3) No consideration other than the execution of the agreement, contract, or waiver shall be necessary to its validity, whether executed before or after marriage.
[5] This basis of the statutory distinction is demonstrated by the fact that if the marriage is ended by dissolution, rather than death, the statute is inapplicable so that an agreement made without fair disclosure does not affect the spouse's continuing financial obligations. Weintraub v. Weintraub, supra; Del Vecchio v. Del Vecchio, 143 So.2d 17 (Fla. 1962).
[6] In this light, we ascribe no particular significance to the fact that Sec. 732.702(2) refers to agreements "executed" before or after marriage. See Barrington v. State, 145 Fla. 61, 199 So. 320, 323 (1940); Satz v. Blankenship, 407 So.2d 396 (Fla. 4th DCA 1981). Thus, in Weintraub, supra, the supreme court stated that the "statute makes valid all agreements entered into before marriage, even in the absence of disclosure." [e.s.]
[7] Buffington v. Buffington, 151 Ind. 200, 51 N.E. 328 (1898); Kohl v. Frederick, 115 lowa 517, 88 N.W. 1055 (1902); Haraldson v. Knutson, 142 Minn. 109, 171 N.W. 201 (1919) (under statute not rendering such agreements "void," oral antenuptial agreement becomes enforceable by later writing); compare Hunt v. Hunt, 171 N.Y. 396, 64 N.E. 159 (1902); Rowell v. Barber, 142 Wis. 304, 125 N.W. 937 (1910) (contrary result where statute provides oral agreement "void").
[8] The appellants make the alternative contention that even if the statutory "fair disclosure" requirement is applicable, it was satisfied in this case. This argument is based in part upon the fact that, since Mrs. King's estate was the larger, Mr. King gave up much more than she in their mutual waivers. Hence, it is claimed, she was not "the less financially secure party" to whom the "fair disclosure" requirement applies in the first place. See Weintraub v. Weintraub, supra; Del Vecchio v. Del Vecchio, supra. Putting it somewhat differently, it is said that the failure precisely to disclose his less significant assets could not have causally affected her decision to forego her less valuable rights in his estate in return for his waiver of his more valuable rights in hers and that, therefore, the "fair disclosure" contemplated by § 732.702(2) was essentially satisfied even if no actual disclosure may have been made at all. While the basis of our decision makes it unnecessary to reach the merits of these assertions, we do note that they are neither unsubstantial nor devoid of support in the decided cases. See Anderl v. Willsey, 193 Neb. 698, 229 N.W.2d 46 (1975); Merrill v. Estate of Merrill, 275 Or. 653, 552 P.2d 249 (1976); In re Estate of Strickland, 181 Neb. 478, 149 N.W.2d 344, 353 (1967) ("She now asserts that she was not informed of the value of the husband's property and was therefore defrauded, when she well knew at the time she was getting no property at all. If she knew that she was to get nothing, as she did, a failure to disclose the value of the husband's property appears to have been of little consequence to her at the time."); In re Estate of Davis, 20 N.Y.2d 70, 281 N.Y.S.2d 767, 228 N.E.2d 768, 770 (1967) (no requirement of disclosure even if husband wealthier than wife, since "[i]f she had predeceased her husband he could have asserted no claim against her estate. It requires more than the circumstances here to rule that this agreement gave her the option to abide the event of which died before the other, being sure that if she predeceased him he could not take any of her estate against her children, but leaving it open to her, if old mortality turned the other way, to take against his will ... as though no agreement had been made.")