[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This petition seeking a dissolution of marriage and other relief came to this court by complaint dated July 7, 1992 and returnable July 21, 1992.
In the prayer for relief, among other things, the complaint asks for enforcement of the terms of the prenuptial agreement. The defendant appeared by counsel on July 17, 1992.
Thereafter, pursuant to defendant's motion for alimony pendente lite and other relief dated July 16, 1992, the motion came before the court, Walsh, J., and orders were entered pursuant to a stipulation on August 3, 1992.
Item 1 in the stipulation provided that there should be alimony pendente lite in the amount of $800 per week for 52 weeks or until final hearing, whichever is first.
Item 2 provided that the court at final hearing would decide whether to apply these payments to the prenuptial agreement terms.
The August 3, 1992 stipulation provided also for other matters such as the removal of items of personal property from the residence, division of personal property, the payment of certain bills, a restraining order as to assets, maintenance of medical insurance and other types of insurance. CT Page 2021
Financial affidavits were filed by the parties.
Thereafter, a motion to extend pendente lite alimony was granted by the court, Booth, J., for ten weeks and subsequently an additional four weeks by Teller, J.
An answer and cross complaint were filed by the defendant on January 6, 1994, and among other prayers for relief, the defendant asks that the court "set aside the validity of prenuptial agreement."
The parties appeared for trial to the court on January 6, 1994, and the matter continued on January 7, 1994, January 11, 1994, January 12, 1994, January 13, 1994 and January 14, 1994.
The following facts are found.
The plaintiff has a hearing disability, complete impairment in the right ear, 60 percent loss in left ear.
Plaintiff is age 75.
Plaintiff and defendant intermarried on May 11, 1990 at Brattleboro, Vermont. The defendant's birth name was Cox.
Plaintiff is a life long resident of Connecticut.
There were no children issue of this union.
The plaintiff and the defendant separated on September 15, 1992.
The plaintiff has one daughter issue of a prior marriage and two grandchildren.
The plaintiff had a double bypass heart operation in August 1993, and now has a prostate problem.
Plaintiff wears a hearing aid which affects his manner of speaking.
Plaintiff graduated from Norwich Free Academy (a high school) in 1935 and has had no further formal education. CT Page 2022
Plaintiff has been associated with S. Levin Co., a wholesale liquor distributor, for 40 years.
Plaintiff first met defendant in 1985, at which time her name was Hendel.
This marriage was the defendant's third marriage, both prior unions ending in divorce.
Plaintiff's home was at 41 Lamphere Road, which residence was built in 1981.
The plaintiff and the defendant lived together without being married from May 1988 to the date of this marriage in May 1990.
Prior to the marriage, the defendant had worked at Filene's in cosmetics, was skilled as a seamstress and as a hairdresser.
After the marriage, the wife left her employment.
The topic of marriage was raised by the defendant early in 1990, the defendant indicating that grandchildren might be confused by different last names of the parties.
The plaintiff had been married and divorced twice before this union.
Plaintiff indicated that "I won't get married unless there is a prenuptial agreement."
The defendant indicated that this request was not unusual and that it was agreeable.
Plaintiff then sought the benefit of counsel and told the defendant to get her own attorney.
Prior to this present marriage, the plaintiff had been single for 30 years.
Prior to the execution of the prenuptial agreement, the defendant discussed its terms with her friend, Janet Porte. CT Page 2023
Plaintiff was represented by counsel in the preparation and execution of the prenuptial agreement.
Defendant was represented by counsel, which counsel was a partner in a law firm and the counsel who handled any prenuptial agreements that her firm was involved in.
Defendant and her counsel initially conferred on a draft of the prenuptial agreement, which had been prepared by plaintiff's counsel on March 6, 1990. The initial conference was about one hour in duration.
Defendant's counsel may have had the draft agreement before the March 6, 1990 meeting or the defendant may have brought it with her to the conference.
Defendant's primary concern as to the agreement had to do with the possibility of the plaintiff predeceasing her. Defendant and her counsel reviewed the proposed agreement and its enforceability.
Defendant's counsel negotiated certain changes in the agreement with plaintiff's counsel. Defendant's counsel had telephone conversations with plaintiff's counsel concerning the agreement.
No alternate draft proposal was submitted by defendant's counsel to plaintiff's counsel concerning the agreement.
Defendant's counsel conferred by phone with the defendant concerning the agreement on March 23, 1990. Defendant's primary concern as to the agreement was her prospective husband's age, defendant was not concerned with the possibility of a divorce.
Defendant and her counsel conferred again on March 30, 1990, concerning the agreement.
The prenuptial agreement was signed on April 10, 1990, by the defendant at her attorney's office. The statement as to the defendant's net worth was prepared by her attorney.
The respective financial affidavits were affixed to the agreement prior to its execution. CT Page 2024
At the time of execution of the agreement, defendant's counsel went over the agreement paragraph by paragraph with the defendant.
The financial affidavits appended to the agreement were reviewed prior to execution of the agreement by the defendant and her counsel. Defendant's counsel was satisfied that the defendant understood all of the terms of the agreement. Defendant was not "rushed" into signing the agreement.
The plaintiff was not present when the defendant executed the agreement on April 10, 1990. Defendant's counsel spent at least four and one half hours with the defendant on various dates, including April 10, 1990, going over, reviewing and executing the agreement. Defendant paid her own counsel for legal services.
Defendant understood that the agreement would protect her assets for her children as well as the benefits to plaintiff.
Defendant was aware of the financial assets of the plaintiff prior to the prenuptial agreement, based on knowing that the plaintiff was "well off" and was "comfortably situated."
Defendant believed the agreement would be enforceable and so testified. Defendant's counsel was aware of legal considerations as to prenuptial agreements and the criteria incident thereto.
Defendant acknowledged the plaintiff's statement to her that there would be a marriage only if there was a prenuptial agreement.
Defendant agreed to having a prenuptial agreement and so testified. Defendant acknowledged reviewing the prenuptial agreement pay [page] by page with her counsel and that the execution thereof was her free act and deed.
Defendant's education consisted of graduating from high school or its equivalent in England and then a five-year apprenticeship as a hairdresser in England.
Defendant had a disc operation several years ago in England. Defendant was age 54 at the time of the marriage on April 10, 1990. Defendant stated she did not care how much the CT Page 2025 plaintiff was worth and so testified.
During the two-year period that the parties lived together before being married, the relationship was good. Plaintiff gave defendant $250 a week and paid all other expenses. The parties enjoyed yachting on a vessel owned by plaintiff. There were numerous dinners and social events and plaintiff gave defendant gifts.
The marriage of the parties took place approximately one month after the prenuptial agreement was signed when the parties decided to go to Vermont and be married by a Justice of the Peace. At the time of the signing of the prenuptial agreement, no wedding date had been set.
After the marriage, the parties resided together for 28 months. There was friction between the defendant and plaintiff's daughter by a prior marriage, Jane.
Problems developed in the relationship after the marriage. During the marriage, the plaintiff bought the defendant jewelry, pearls, diamond earrings and a Bichon Freise dog.
Plaintiff gave defendant $2,500 for a facial medical procedure to eliminate wrinkles.
The parties had an intimate relationship before the marriage. At some time in the past, the plaintiff had established a trust for his daughter, Jane.
Plaintiff and defendant filed separate income tax returns.
On occasion, plaintiff gave defendant the use of credit cards. Plaintiff paid for trips to England by defendant. Prior to the marriage, plaintiff and defendant went on many trips and a 17-day cruise.
Plaintiff initiated the petition for dissolution after the defendant had caused his arrest by the Waterford Police Department on a claim of physical abuse. Plaintiff has no record of conviction for any offense.
Plaintiff had a professional housekeeper during the period the parties lived together and after the marriage. CT Page 2026
Plaintiff took defendant with him on the horse show circuit, attended various parties and gatherings.
In the opinion of her counsel who testified at the time of trial, at the time of executing the prenuptial agreement the defendant was aware of all of its terms and competent.
Defendant first became a resident of Connecticut in 1977. During the period 1986 to 1988, defendant resided in England where she conducted a small business. Within five months of her return from England in 1988, defendant was living with plaintiff in Waterford. During the two years that the parties lived together prior to being married, defendant acknowledged plaintiff was attentive and generous. Defendant was a member of the New London Country Club.
The defendant's first marriage to Mr. Elia was of approximately 20 years duration. The defendant's second marriage to Mr. Hendel was of approximately seven years duration.
Several years ago, while in England, the defendant had surgery on her back.
The defendant is an avid golf enthusiast.
Defendant is presently a resident of Sarasota, Florida.
Defendant has two married sons issue of her first marriage and a number of grandchildren.
At the time the defendant moved into the plaintiff's Waterford home, her assets consisted of the settlement in the Hendel dissolution, proceeds from a personal injury claim, furnishings and a motor vehicle. Defendant acknowledged that none of her assets were expended during the course of her relationship with the plaintiff.
Defendant knew of the prior marriages of the plaintiff and also knew of a palimony suit which had been brought against him and successfully defended.
Plaintiff was not involved in any way in the selection of counsel by the defendant. CT Page 2027
The plaintiff's and the defendant's financial arrangements remained constant throughout the time they lived together. Their funds were segregated, they never had joint checking accounts or common credit cards.
On one occasion, the defendant opened a posted letter addressed to the plaintiff which contained a check, signed the plaintiff's name and cashed the check although she had no authority to do so.
The defendant processed an insurance claim under existing coverage provided by plaintiff, concerning the loss of a diamond ring. The plaintiff did not know of this until many months later and observed the "lost ring" in his wife's jewelry box.
There was an incident at Montauk Point during a boating trip when there was an argument between the parties relating to plaintiff's daughter, which argument and dispute was initiated by the defendant.
Plaintiff did restrain the defendant on this occasion and put his hands on her neck and shoulders.
After the dispute, the parties remained on the boat overnight and returned to New London the next day.
There was an occurrence at New London after the parties had returned when the defendant, in leaving the boat, fell into the water and sustained bruises and injuries. The defendant's fall was in no way occasioned by any conduct of the plaintiff.
On June 25, 1992, an incident occurred at the home in Waterford involving the Bichon Frieze dog, and in order to speak with the defendant about problems in the marriage, the plaintiff did block the exit from the bedroom door and held defendant by the wrists. The defendant, in an effort to leave the bedroom, attempted to forcefully pass plaintiff in the doorway and defendant struck the door framing and sustained bruises and injuries. Thereafter, the parties adjourned to a different room and did discuss marital problems
Thereafter, defendant left the residence, went to the Waterford Police Department and made a complaint against the plaintiff. That night, the defendant stayed at the Porte home. CT Page 2028 Thereafter, the defendant returned to the Waterford home and resided with the plaintiff until September 15, 1992, when she vacated the premises and removed herself to Florida.
The court notes that in the years 1989, 1990, 1991 and 1992, there has been a steady and substantial decline in the income of Mr. Levin as reflected in Defendant's Exhibits 1, 2, 3 and 4, the federal income tax returns.
The court notes the following from Plaintiff's Exhibit B, the prenuptial agreement of April 9, 1990.
A reference on page one of a detailed, complete and accurate disclosure of the respective assets of each of the parties which is reflected in the statement of financial condition. The agreement, consisting of 15 pages plus five pages of financial condition is extremely well and carefully drawn and covers all eventualities.
On page eight, paragraph 8(a), the provisions concerning the possibility of a dissolution of the marriage and the terms and conditions that would then be implemented are clear and precise.
". . . . Patricia agrees to accept as periodic alimony the sum of money equal to two thousand ($2,000) dollars per month for that number of months that is equal to the number of months of the parties' marriage from inception to the date of separation but not to exceed 36 months in any event. . . ."
The statement of financial condition of the plaintiff prepared by certified public accountants is comprehensive and straightforward and as detailed as one could reasonably expect. There does not appear to be anything deceptive or misleading in the financial statement.
DISCUSSION OF THE ISSUES
Prior to the advent of "no-fault" divorce, public policy disfavored prenuptial agreements on the basis that they facilitated divorce, an event which itself was viewed as contrary to the public good. With the spread of "no-fault" divorce, courts have taken the view that since divorce has become common place in American society, premarital agreements which contemplate divorce are no longer, per se, violative of public policy and, indeed, may be in furtherance of a public policy to encourage intended spouses CT Page 2029 to prearrange their own affairs, if by doing so, they decrease the likelihood of subsequent acrimonious and wasteful marital litigation.
In 1980, the Supreme Court of Connecticut joined the growing number of courts holding that prenuptial agreements, if certain conditions are met, are no longer unenforceable as against public policy. McHugh v. McHugh, 181 Conn. 484 (1980). Thus, premarital agreements are enforceable in Connecticut if three conditions enunciated in McHugh are met; the contract must be validly entered into; its terms do not violate public policy; and, the circumstances of the parties at the time of the dissolution are not so far beyond the contemplation of the parties at the time the contract was entered into as to cause enforcement of the contract to work an injustice. Within these general guidelines, the court, in McHugh, opined that each agreement must be reviewed on an individual basis to determine its enforceability.
 The validity of an antenuptial contract depends upon the circumstances of the particular case. Wulf v. Wulf, 129 Neb. 158, 161, 261 N.W. 159 (1935). Antenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) its terms do not violate statute or public policy; and (3) the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice.
 An antenuptial agreement is a type of contract and must, therefore, comply with ordinary principles of contract law. To determine whether an antenuptial agreement relating to property was valid when made, courts will inquire whether any waiver of statutory or common-law rights, or the right to a judicial determination in any matter, was voluntary and knowing. A party must, of CT Page 2030 course, be aware of any right that he possesses prior to a proper waiver of it. The duty of each party to disclose the amount, character, and value of individually owned property, absent the other's independent knowledge of the same, is an essential prerequisite to a valid antenuptial agreement containing a waiver of property rights. "The burden is not on either party to inquire, but on each to inform, for it is only by requiring full disclosure of the amount, character, and value of the parties' respective assets that courts can ensure intelligent waiver of the statutory rights involved.
 The court's first inquiry, then, is to ascertain whether the agreement complies with the ordinary principles of contract law and whether its terms and the circumstances surrounding its execution are such as to demonstrate that the parties were aware of their legal rights and their respective assets and liabilities, and proceeded by the agreement to alter those rights in a fair and voluntary manner.
 It is clear that antenuptial agreements will not be enforced where to do so would violate the state statutes or public policy. See annot., 57 A.L.R.2d 942 2. In this regard, it is necessary to distinguish between the violation of statute and the informed and voluntary waiver of rights created by statute. The former is prohibited-while the latter is typically the object of such agreements. Similarly, antenuptial agreements that promote, facilitate or provide an incentive for separation or divorce are generally opposed to public policy and of dubious enforceability.
 Finally, an antenuptial agreement will not be enforced where the circumstances of the parties at the time of the dissolution are so CT Page 2031 far beyond the contemplation of the parties at the time the agreement was made as to make enforcement of the agreement work an injustice.
McHugh v. McHugh, 181 Conn. 482 (1980)
The defendant acknowledges that she was separately represented by an attorney of her own selection who read and explained each and every paragraph of the agreement to her before she signed it, and that the plaintiff's disclosure of assets was affixed to the agreement before she signed it. She claims, however, that the agreement was not validly entered into because she did not read the disclosures and because the disclosure did not contain an explicit recitation of Mr. Levin's income. As to the validity of the contract, while both parties agree that the plaintiff told the defendant he would not marry her without a prenuptial agreement, the defendant appears to argue that this insistence was tantamount to duress or coercion.
In considering whether a prenuptial contract has been validly entered into, courts have found relevance in the spouse's prior experiences. By way of example, the Supreme Court of Colorado, in upholding the validity of a prenuptial agreement stated:
 "As we examine the antenuptial agreement here executed, we are aware that Mrs. Newman in effect gave up substantial rights to marital property. However, she was a mature person who had once before been through the financial difficulties of a divorce." Newman v. Newman, 653 P.2d 728, 733 (1982).
It is a constant thread in judicial decision making on this aspect of the topic that the parties' ages, prior divorce experiences, as well as the existence of children from prior marriages to protect in the intended endeavor are all considerations in determining the capacity to contract as well as the adequacy of the consideration for the contract. Here, both parties were wise to the process of divorce; both have children and grandchildren whose interest they sought to protect by the execution of the agreement.
The defendant claims the contract is unenforceable CT Page 2032 because the financial disclosure by the plaintiff does not explicitly state his income. "Fair disclosure is not synonymous with detailed disclosure such as a financial statement of net worth and income. In the seminal work on this topic, Lindey states: "While the disclosure should be full, fair and open, it has been said it need not be a drastically sweeping one, and the wife need not know the husband's exact means, so long as she has a general idea of his property and resources." Lindey, Separation Agreements and Antenuptial Contracts, at 90-44, cited with approval in Hartz v. Hartz, 248 Md. 47, 234 A.2d 865 (1966). Here, while the financial disclosure by the plaintiff did not separately detail his income, it revealed that he had cash and retirement assets worth in excess of one million six hundred thousand ($1,600,000) dollars. (Plaintiff's Exhibit B.) Additionally, the parties had lived together for a period of approximately two years before the marriage, and during this premarital period, the defendant had lived in the plaintiff's home becoming familiar with the nature of his assets as well as his lifestyle. Thus, while the defendant may not have had precise information as to the plaintiff's income, she knew him to be a man of substance and substantial cash flow with access to substantial amounts of cash.
In addition to the quality and quantity of the disclosure made by the plaintiff, the defendant is also bound by the recitation in the agreement that states: ". . . Whereas, each of the parties have made a detailed, capable and accurate disclosure of the respective net worth and income, to each other, to the best of their ability, copies of which disclosure are attached hereto and made a part hereof."
In this case, not only was the defendant's knowledge sufficient by reason of her personal knowledge based on having lived with the plaintiff as well as by the recitals in the disclosure, but she affirmed her knowledge in the body of the contract. At this juncture, she cannot disclaim that which she has previously affirmed.
The defendant further claims that, even if there was adequate disclosure, she did not read it. The short answer to this claim is that her indifference to the terms of the agreement and to the plaintiff's financial disclosure is immaterial.
While the defendant did not specifically claim duress, and in fact acknowledged both on cross examination and in the CT Page 2033 document itself that she freely and voluntarily executed the agreement, she testified that the financial disclosure was provided to her on the same day that she signed the agreement. The answer to that issue is that the defendant determined the circumstances and the date of her signing. There was no scheduled date for the wedding which ultimately took place one month later. The defendant had more than ample opportunity to review the document as well as the financial disclosure but she chose to sign it on the date it was executed. She points to no pressure from the plaintiff except that he would not marry her until the agreement was signed. McDonald v. McDonald, 215 Ala. 179,110 So. 291 (1926), cited with approval in Ruzic v. Ruzic, 549 So.2d 72
(1989).
The defendant claims that even if the contract was validly entered into, it should not be enforced because its terms violate public policy. The contract provides for a specific amount of spousal support for a limited time period. It further provides that each waives any entitlement to the estate of the other in the event of divorce. At the time of the execution of the contract, Mr. Levin was seventy-one (71) years of age with a life expectancy of 11.2 years. The court takes judicial notice of life expectancy tables. Butler v. Steck, 146 Conn. 114 (1959). A reading of the agreement reflects that the plaintiff committed himself to up to three years of alimony subsequent to separation, a time period which could well have eclipsed his life expectancy. Additionally, this provision must be read in light of the defendant's then liquidity and expectancy. She had been married to a man, Mr. Elia, for approximately twenty years, thus accruing the right to receive social security based on her wages, and eligible to receive it once she attained the age of 62.42 U.S.C.S. 402, et. seq. At the time of the agreement, she was therefore no more than seven years away from social security entitlement in the event she became divorced from the plaintiff. Additionally, the defendant had in excess of $100,000 in liquidity at the time.
The court concludes that not only was the defendant well aware of the contract's support provisions, but she signed the contract, as she later reported to her friend, Mrs. Porte, with the expectation that after the marriage, she would be able to change the plaintiff's mind to achieve a more generous settlement in the event of divorce.
The defendant alleges that the plaintiff physically CT Page 2034 assaulted her and that the marriage is ending because of his assaultive behavior. In response, the plaintiff claims that he did not physically assault the defendant, and that any incidents which may have occurred between the parties were not the cause of this dissolution. In this instant case, the testimony of the parties is contradictory; it cannot be harmonized.
Subsequent to the commencement of this action, the defendant caused her husband to be served with a four-count complaint based on her allegations of physical assault. (The court has taken judicial notice of this pending action captioned as Levin v. Levin, Superior Court at New London, Docket No. CV93-527256S, at counsel's request.) In the fifth paragraph of the first count of her complaint, the defendant alleged that as a result of injuries she claims to have sustained on June 12, 1992, she was ". . . required to spend various sums of moneys for medical care and treatment necessitated by her injuries." During the trial of this matter, the defendant admitted that, in fact, she neither sought nor received any medical care or treatment resulting from this incident. While the defendant may claim that these are only the allegations of her counsel in that action, pleadings by counsel are taken, as a matter of law, as statements of the party and may be admitted directly against that party on the issue of credibility in a different action. Miles, Trustee, et al v. Strong, et al, 68 Conn. 273 (1896); Wright v. Blakeslee,102 Conn. 162 (1925); Kucza v. Stone, 155 Conn. 194 (1967).
The agreement provides, in pertinent part, that in the event of marital dissolution, the defendant shall be entitled to receive, as support, the sum of two thousand ($2,000) dollars a month for each month the parties resided together up to a total of thirty-six months. It is agreed between the parties that this time period was twenty-eight months. Thus, by mathematical calculation, the defendant's maximum support under the agreement would be $56,000. During the pendency of this matter, by agreement of the parties and court orders, the defendant has now received this amount.
Aside from the issue of determining the validity and enforceability of the prenuptial agreement, the court is presented with the issue of whether or not the alimony pendente lite already paid should be in effect credited against the terms of the agreement.
The authority to award alimony pendente lite is CT Page 2035 expressly set forth in Connecticut General Statutes 46b-83.
The purpose of an award of temporary alimony is to provide for the wife while she is living apart from her husband pending a determination of the issues in the case.
Of necessity, a determination of the merits or validity of any prenuptial agreement cannot be known until a full, complete and fair hearing of the matter is had on its merits. Considerations of public policy are involved in trying to maintain the status quo awaiting an orderly determination of the terms of the agreement. See Fitzgerald v. Fitzgerald, 169 Conn. 147.
The court is also presented with the issue of awarding attorney's fees mindful of the provisions of the prenuptial agreement which touches on this issue. See Plaintiff's Exhibit B.
The decision to award counsel fees in a dissolution case is clearly within the trial court's discretion. Holly v. Holly,194 Conn. 25.
In addition to considering the terms of the agreement, the court is entitled to consider the respective financial resources of the parties in light of the statutory criteria including Connecticut General Statutes 46b-62 and 46b-83. Admittedly, there is a very great disparity in the income, assets and resources between the parties.
The prenuptial agreement entered into here was done by persons of mature age, persons who had each experienced two prior marriages and divorces, parties who voluntarily and freely entered into an agreement aware of all its terms and conditions and parties that were both represented by experienced counsel who devoted considerable time and effort to fashioning the agreement. There was full, complete and fair disclosure of all financial issues and nothing forced nor hurried was done in reflecting on or executing the agreement.
All the cards were laid on the table and a level playing field for both parties existed.
The court is satisfied that all of the criteria required by the McHugh case have been met. In fact, the plaintiff's worth and assets have decreased and diminished between the time of the agreement and the time of trial. CT Page 2036
The court finds that the prenuptial agreement is valid and enforceable and the parties are bound thereby.
The pendente lite payments of alimony are not to be credited to the terms of the agreement. To allow these payments as a credit would be contrary to public policy of providing interim spousal support pending a resolution on the merits.
The court will allow reasonable attorney's fees in the amount of $15,000.
The defendant was entitled to be represented so that her interests are properly protected and public policy and equity suggest that an allowance be made therefore, particularly mindful of the financial disparity of the parties' positions.
The court has considered the provisions of 46b-80 et. seq. The court has carefully weighed the credibility of the testimony elicited in this proceeding.
The court finds it has jurisdiction. There are no minor children involved. There is no issue of public assistance. Both parties were physically present before the court with their counsel during the entire trial.
The court grants a dissolution on the grounds of irretrievable breakdown.
Payments may be made in accordance with the prenuptial agreement, $2,000 a month for 28 months.
Austin, J.